**E-FILED**
Friday, 02 November, 2007  01:49:14 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

|  |  |
|---|---|
| OPERATIVE PLASTERERS' AND CEMENT MASONS LOCAL #18 ANNUITY FUND, OPERATIVE PLASTERERS' AND CEMENT MASONS' LOCAL #18 PENSION FUND and CEMENT MASONS' LOCAL #18 AREA #539 APPRENTICESHIP AND TRAINING FUND, | NO. 06-CV-3232 |
| Plaintiffs | |
| Vs. | |
| J.P. PHILLIPS, INC. | |
| Defendant and Third Party Plaintiff, | |
| OPERATIVE PLASTERERS' AND CEMENT MASONS' INTERNATIONAL ASSOCIATION OF THE UNITED STATES AND CANADA, AFL-CIO, LOCAL #18 | |
| Third Party Defendant. | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**AGAINST PLAINTIFF'S AND CROSS MOTION FOR SUMMARY**

**JUDGMENT AGAINST THIRD PARTY DEFENDANT**

Now Comes Defendant, J. P. PHILLIPS, by it's attorney's moves this Court for entry of

Summary Judgment Against Plaintiff's OPERATIVE PLASTERERS' AND CEMENT

MASONS LOCAL #18 ANNUITY FUND, OPERATIVE PLASTERERS' AND CEMENT MASONS' LOCAL #18 PENSION FUND, and CEMENT MASONS' LOCAL #18 AREA #539 APPRENTICESHIP AND TRAINING FUND, for its Cross Motion for Summary Judgment against Third Party Plaintiffs, J. P. PHILLIPS, INC., against OPERATIVE PLASTERERS' AND CEMENT MASONS' INTERNATIONAL ASSOCIATION OF THE UNITED STATES AND CANADA, AFL-CIO, LOCAL #18, pursuant to Fed. R. Civ. P. 56. In Support, Defendant states:

1.    Defendant's supporting Memorandum will also be combined with Defendant's Response to Third Party Defendant's Motion for Summary Judgment, since a combined motion and response are so interwined and so interrelated that logic dictates one memorandum. Thus, Defendant has exceeded the 15 page limit under local rule.

2.    Undisputed Material Facts in Third Party Defendant's Motion for Summary Judgment are not contested.

3.    **Defendant's Combined Additional Material Facts and Its Undisputed Material Facts:**

A.    An election was conducted under the Rules and Regulations of the National Labor Relations Board, the certified exclusive collective bargaining representative for JPP employees, working out of JPP's office at 3220 Wolf Road, in Franklin Park, Illinois is the Illinois Locals 56 and 74, International Union of Bricklayers and Allied Craftworkers' AFL-CIO. (Pilolla Declaration ¶3).

B.    JPP performed plastering work at the Illinois State Capitol Building in Springfield, Illinois ("Project") in 2006 using employees from JPP's office in Franklin Park, Illinois (Pilolla Declaration ¶4).

C.    While performing work on the Project, JPP paid its employees their regular wages pursuant to its CBA with Bricklayers' Locals 56 and 74 ($35.50 per hour for foremen, and $33.50 per hour for plasterers), which are significantly higher than the wage rate called for in the PLA for Locals 18 ($26.50 per hour for foremen and $25.00 per hour for plasterers.) (Pilolla Declaration ¶5).

D.    JPP paid all union dues to Bricklayers' Locals 56 and 74, and not pursuant to the PLA. (Pilolla Declaration ¶6).

E.    JPP never paid any fringe benefit contributions to the Operative Plasterers' and Cement Masons' Local #18 Annuity Fund, Operative Plasterers' and Cement Masons' Local #18 Pension Fund or the Cement Masons' Local #18, Area #539 Apprenticeship and Training Fund pursuant to the PLA. (Pilolla Declaration ¶7).

F.    JPP paid fringe benefit contributions for all of its employees for the work performed on the Project pursuant to its CBA with Bricklayers' Locals 56 and 74.  JPP paid higher fringe benefit contributions under its CBA ($14.47 per hour) than what would have required to the Plasterers' under the PLA ($13.51 per hour). (Pilolla Declaration ¶8).

G.    JPP never submitted to any term or condition of the current CBA of Local 18 of the Plasterers'. (Pilolla Declaration ¶9).

H.    The Building and Construction Trades Department (BCTD) of the AFL-CIO and its constituent International and National unions have established a Plan for the

Settlement of Jurisdictional Disputes in the Construction Industry, providing for final and binding arbitration of such disputes (Exh.D Preamble).

  I.  Both Bricklayers and OPCMIA are affiliates of the BCTD (Driscoll Decl., p. 3, n. 1).

  J.  Local unions affiliated with BCTD International and National unions are bound by the Plan. (Exh. D, Art. I (b)).

  K.  Local #18's CBA specifically binds it and its signatory contractors to Plan for the Settlement of Jurisdictional Disputes In the Construction Industry ("Plan"). (Exh. E, Art II.B).

  L.  When the jurisdictional dispute arose in 2006 between Bricklayers and OPCMIA over plastering work at the Illinois State Capitol Building, a complaint was filed and an arbitration held pursuant to the Plan. (Driscoll Decl. ¶ 13).

  M.  On August 24, 2006, Plan Arbitrator John McMahon issued a decision in the dispute between OPCMIA Local 18 and the Bricklayers over the plastering work at the Illinois State Capitol Building. The Arbitrator ruled that the employer's assignment of the work was dispositive and that the plastering work on the State Capitol Building was awarded to the Bricklayers. (Driscoll Decl. ¶ 16, Exh. F).

  N.  In a Plan arbitration, also decided in August, 2006, Arbitrator John McMahon, an arbitrator under the Plan, determined that the work performed by JPP at the Project should have been assigned to the Bricklayers and that the PLA arbitration was without jurisdiction and improper. (Exhibit F).

O.    On January 5, 2007, the OPCMIA acknowledged in writing that the decision of Arbitrator Zipp had no force and effect and agreed to accept and comply with the McMahon decision. (Exhibit G).

P.    The OPCMIA entered into a Federal Court Consent Order on February 14, 2007, which confirmed the McMahon Aribtration Award after reciting its directive ordering the OPCMIA and its Local Unions not to file or pursue any action to enforce the Zipp Award or to engage others to do so on their behalf. (Exh. H at p.2; Exh. F at p2).

Q.    On February 14, 2007 the .United States District Court for the District of Columbia issued a consent Order confirming Plan Arbitrator McMahon's Award.  The Court's Order recited the background and Plan authority for Arbitrator McMahon's award, quoting from the order of the Arbitrator that OPCMIA and Local 18 were enjoined from taking action to implement the Zipp award. (Exh.H).

R.    Arbitration decisions under the Plan must be complied with by all affiliated unions. (Exh. D, Art. VII, Sec. 2; Art. IX, Sec. 2(a); Art. X, Sec. 4).

S.    Although most arbitrations under the Plan  concern jurisdictional disputes on a particular construction project, the Plan provides another type of proceeding with a different, broader award.  Article X provides for a more comprehensive arbitration award and more sweeping award in a repetitive dispute that is disruptive of the industry or seriously jeopardizes the operational integrity of the Plan. (Driscoll Decl.¶ 11).

T.    Article X of the Plan further provides that "Decisions of the National Arbitration Panel "shall be immediately recognized" under the Constitution and the Plan

and "shall be immediately accepted and complied with by the disputing unions." (Exh. D Art. X, Sec. 4).

U.     After extensive presentations, an Arbitration Panel constituted under Article X of the Plan decided that "all jurisdictional disputes between the BAC and the OPCM [OPCMIA] that are brought before the Plan shall be resolved in favor of the work assignment of the involved Employer." (Exh.H)

V.     Subsequently the National Arbitration Panel clarified its decision to provide that it applied only to plastering or cement mason disputes. (Ex. K, ¶14 p.2).

W.     After the decision of the Article X Arbitration Panel was rendered, OPCMIA General President John J. Dougherty characterized the arbitration decision as wise, he urged all parties to live with the result, and he quoted from the National Plan provisions requiring all affiliated unions to comply with the decisions and rulings of a National Arbitration Panel and to accept and comply with such rulings immediately. (Exh. A).

4.     Defendant's submit the declarations of TIMOTHY J. DRISCOLL and MICHAEL PILOLLA, both attached hereto.

5.     Defendant's respectively submits its Combined Response to Third Party Defendant's Motion for Summary Judgment and Defendant's Memorandum in Support of Defendant's Motion for Summary Judgment against Plaintiff's and 3rd Party Defendant.

WHEREFORE, Defendant prays for entry of Summary Judgment in its favor against Plaintiff's and against Third Party Defendant or in the alternative, if the Court grants the motion for summary Judgment, then dismiss the Third Party Complaint as moot.

Respectfully Submitted,

**J. P. Phillips, Inc.**

By: /S/ Stanley E. Niew
One of its attorneys

STANLEY E. NIEW
NIEW LEGAL PARTNERS
600 Hunter Drive, Suite 310
Oak Brook, Illinois 60523
(630) 586-0110 phone
(630) 586-0120 fax
Attorney # 6286810

## DECLARATION OF MICHAEL PILOLLA

I, MICHAEL PILOLLA, under penalties of perjury under the laws of the United States of America, hereby state:

1.  I am President of J. P. Phillips, Inc. (hereafter, "JPP").

2.  JPP is engaged in the business of plastering and related services.

3.  As a result of an election conducted under the Rules and Regulations of the National Labor Relations Board, the certified exclusive collective bargaining representative for JPP employees, working out of JPP's office at 3220 Wolf Road, in Franklin Park, Illinois is the Illinois Locals 56 and 74, International Union of Bricklayers and Allied Craftworkers' AFL-CIO.

4.  JPP performed plastering work at the Illinois State Capitol Building in Springfield, Illinois ("Project") in 2006 using employees from JPP's office in Franklin Park, Illinois.

5.  While performing work on the Project, JPP paid its employees their regular wages pursuant to its CBA with Bricklayers' Locals 56 and 74 ($35.50 per hour for foremen, and $33.50 per hour for plasterers), which are significantly higher than the wage rate called for in the PLA for Locals 18 ($26.50 per hour for foremen and $25.00 per hour for plasterers.)

6.  JPP paid all union dues to Bricklayers' Locals 56 and 74, and not pursuant to the PLA.

7.  JPP never paid any fringe benefit contributions to the Operative Plasterers' and Cement Masons' Local #18 Annuity Fund, Operative Plasterers' and Cement Masons' Local #18 Pension Fund or the Cement Masons' Local #18, Area #539 Apprenticeship and Training Fund pursuant to the PLA.

8.  JPP paid fringe benefit contributions for all of its employees for the work performed on the Project pursuant to its CBA with Bricklayers' Locals 56 and 74. JPP paid higher fringe benefit contributions under its CBA ($14.47 per hour) than what would have required to the Plasterers' under the PLA ($13.51 per hour).

9.  JPP never submitted to any term or condition of the current CBA of Local 18 of the Plasterers'.

Affiant further saith not.

Date: October 30, 2007

MICHAEL PILOLLA

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

|  |  |
|---|---|
| OPERATIVE PLASTERERS' AND CEMENT MASONS 'LOCAL #18 ANNUITY FUND, OPERATIVE PLASTERERS' AND CEMENT MASONS' LOCAL #18 PENSION FUND and CEMENT MASONS' LOCAL #18, AREA #539 APPRENTICESHIP AND TRAINING FUND, |  |
|                                   Plaintiffs | No. 06-CV-3232 |
| vs. |  |
| J. P. PHILLIPS, INC., |  |
|                                   Defendant and Third Party Plaintiff, | **DECLARATION OF TIMOTHY J. DRISCOLL IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT DISMISSING THE COMPLAINT AND IN OPPOSITION TO THIRD PARTY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT DISMISSING THE THIRD PARTY COMPLAINT** |
| OPERATIVE PLASTERERS' AND CEMENT MASONS' INTERNATIONAL ASSOCIATION OF THE UNITED STATES AND CANADA, AFL-CIO, LOCAL #18 |  |
|                                   Third Party Defendant. |  |

TIMOTHY J. DRISCOLL, under penalty of perjury, states the following:

1.    I am a member of the International Union of Bricklayers and Allied Craftworkers ("BAC") and have been for over 22 years. I am also the BAC's Director of Trade Union Jurisdiction. As such, I am in charge of disputes arising under the Plan for the Settlement of Jurisdictional Disputes in the Construction Industry (the "Plan") and am generally familiar with

jurisdictional matters involving the construction unions comprising the Building and Construction Trades Department, AFL-CIO ("BCTD").

2.    I make this Declaration in support of Defendant J. P. Phillips, Inc.'s motion for summary judgment dismissing the complaint and in opposition to third party defendant, OPCMIA Local 18's motion for summary judgment dismissing the third-party complaint. I am familiar with the background of the disputes between the OPCMIA and BAC through direct participation in the events that began in about 1998 when the OPCMIA first sought to abrogate the maps and agreements between the two unions that had, for over forty years, allocated jurisdiction over plastering and cement finishing in each county throughout the United States to one union or the other.

3.    I am also familiar with the background events leading up to the instant litigation.

**A.    The Jurisdiction of the two Unions**

4.    BAC and OPCMIA are unique in the construction industry and perhaps in the AFL-CIO itself. Each union has core charter jurisdiction over the same two crafts of plasterers and cement masons (also sometimes known as "cement finishers"). In that respect these unions are unique.

5.    The two unions have had this identical charter jurisdiction for more than one hundred years. In the case of BAC, its jurisdiction over plasterers extends well back into the nineteenth century, its jurisdiction over cement masons dates to the early years of the twentieth century.

6.    BAC, unlike OPCMIA, also represents other trowel trades, such as bricklayers, tile setters and finishers, marble setters and finishers, terrazzo setters and finishers, stone masons,

and pointers, cleaners and caulkers.    Indeed, BAC represents over 100,000 trowel trades craftworkers in every state of the United States, and every province of Canada.    Throughout its existence, and up to the present day, however, plasterers and cement masons have continued to be a significant part of BAC's membership.

7.    For four decades, until the late 1990's, the BAC and OPCMIA observed a series of maps and agreements between the two unions that comprised a territorial allocation covering the entire United States that assigned each county, or portion thereof, in the United States as the territorial jurisdiction of one union or the other.    Thus, in spite of our overlapping craft jurisdiction, the two unions existed in relative peace for forty years.

8.    Beginning in 1998, that peace was shattered when the OPCMIA unilaterally abrogated those territorial maps and agreements, thrusting both unions and their signatory contractors into jurisdictional war throughout much of the United States.

B.    The National Plan for the Settlement of Jurisdictional Disputes.

9.    Because collective bargaining agreements often contain overlapping geographic and craft jurisdiction provisions, the AFL-CIO's Building & Construction Trades Department ("BCTD"), to which all construction unions belonged during the relevant period, has established a National Plan for the Settlement of Jurisdictional disputes in the Construction Industry ("National Plan") to resolve jurisdictional disputes which the contending unions cannot settle on their own.    (Exh. D).    The BCTD Constitution mandates the Plan as the exclusive mechanism for the resolution of jurisdictional disputes between affiliates of the BCTD.[1]

---

[1]    Although some building trades unions have since disaffiliated from the BCTD, none of those unions is relevant to this dispute, and BAC and OPCMIA remain affiliated.

10.    Through a mandatory and expedited arbitration process, the National Plan decides which union has jurisdiction over contested work on a particular construction project. The National Plan also prohibits jurisdictionally-based impediments to uninterrupted progress of work through strikes, work stoppages, grievances or other actions that a BCTD member union may seek to utilize in support of its jurisdictional claim.

11.    The BCTD National Plan adjudicates specific jobsite jurisdictional disputes and generally the arbitrator's decision applies to that dispute only. The Plan, however, provides another type of proceeding in extraordinary circumstances, with a different type of award. Article X of the Plan permits a more comprehensive arbitration and more sweeping award in a repetitive dispute that is disruptive to the industry or seriously jeopardizes the operational integrity of the Plan. If the Plan's Joint Administrative Committee, a joint labor-management committee consisting of various General Presidents of the affiliated International Unions and representatives of several National Construction Contractors Associations, deem the dispute worthy of Article X consideration, they approve use of that Article. Article X provides that the ensuing Panel decision shall then be recognized under the BCTD Constitution and that decision "shall be immediately accepted and complied with by the disputing unions." (Exh D, p. 22).

12.    Upon application by an affected employer, the Plan's Joint Administrative Committee, in 2003, determined that an Article X proceeding was warranted between BAC and OPCMIA. This was the first Article X case since 1978. Pursuant to the National Plan, and after extensive written submissions, a hearing before a three-arbitrator panel was conducted on January 28, 2004, for the purpose of fashioning a remedy "to alleviate the continuing jurisdictional disputes between [BAC] and the [OPCMIA]." (Exh. C , p. 2)

13.    The National Plan then held, inter alia, that:

Henceforth, all jurisdictional disputes between the BAC and the OPCM [OPCMIA] that are brought before the Plan shall be resolved in favor of the work assignment of the involved Employer.

(Exh. K p.2)

14.    In response to a question raised as to the craft scope of their award, the Article X Arbitration panel added a sentence to their decision clarifying that it applied only to the crafts of plastering and cement masonry. The present case concededly involves plastering.

15.    In a widely distributed letter dated February 20, 2004, OPCMIA General President John J. Dougherty characterized the Article X Arbitration Panel decision as wise, urged that all parties live with the result, and quoted from the National Plan provisions that affiliated unions "Shall comply with the decisions and rulings of the ... National Arbitration Panel established hereunder" and that "Decisions of the National Arbitration Panel shall be immediately accepted and complied with by the disputing unions." (Exh. G).

16.    On August 24, 2006, Plan Arbitrator John McMahon issued a decision in the Illinois State Capitol building dispute between OCMIA Local 18 and the Bricklayers that the employer's assignment of the plastering is controlling and that the plastering work on the Illinois State Capitol building in Springfield belongs to the Bricklayers.

17.    On February 14, 2007, the United States District Court for the District of Columbia issued a Consent Order confirming Plan Arbitrator McMahon's award. In this Confirmation Order the Court recited the background and Plan authority for Arbitrator McMahon's Award and quoted from the Arbitration order that OPCMIA and Local 18 "not file

or pursue any other action in an attempt to enforce" the Zipp decision issued by the arbitrator under the Project Labor Agreement.

I declare under penalty of perjury that the foregoing is true and correct.

October 30, 2007

_____
Timothy J. Driscoll

CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of November, 2007, I electronically filed the following documents:

1. Defendant's Motion for Summary Judgment Against Plaintiff's and Cross Motion for Summary Judgment Against Third Party Defendant

2. Defendant's Memorandum in Support of Defendant's Motion for Summary Judgment Against Plaintiff's and Cross Motion for Summary Judgment Against Third Party Defendant

with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

James P. Moody
Cavanagh & O' Hara
407 East Adams
P.O. Box 5043
Springfield, IL 62705

Dated this 2nd day of November, 2007.

By: /s/ G. Ryan Liska
G. Ryan Liska

G. Ryan Liska
BERGLUND & NIEW, P.C.
900 Jorie Blvd., Suite 122
Oak Brook, Illinois 60523
(630) 990-0234

IN THE UNITED STATES
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| OPERATIVE PLASTERERS' AND CEMENT MASONS LOCAL #18 ANNUITY FUND, OPERATIVE PLASTERERS' AND CEMENT MASONS' LOCAL #18 PENSION FUND and CEMENT MASONS' LOCAL #18 AREA #539 APPRENTICESHIP AND TRAINING FUND, | NO. 06-CV-3232 |
| Plaintiffs | |
| Vs. | |
| J.P. PHILLIPS, INC. | |
| Defendant and Third Party Plaintiff, | |
| OPERATIVE PLASTERERS' AND CEMENT MASONS' INTERNATIONAL ASSOCIATION OF THE UNITED STATES AND CANADA, AFL-CIO, LOCAL #18 | |
| Third Party Defendant. | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF**

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**AND CROSS MOTION FOR SUMMARY JUDGMENT**

**AGAINST THIRD PARTY DEFENDANT**

Now Comes Defendant, J. P. PHILLIPS, by it's attorney's moves this Court for entry of

Summary Judgment against Plaintiff's, OPERATIVE PLASTERERS' AND CEMENT

MASONS LOCAL #18 ANNUITY FUND, OPERATIVE PLASTERERS'AND CEMENT MASONS' LOCAL #18 PENSION FUND, and CEMENT MASONS' LOCAL #18 AREA #539 APPRENTICESHIP AND TRAINING FUND, for its Cross Motion for Summary Judgment against Third Party Defendants, J. P. PHILLIPS, INC., and OPERATIVE PLASTERERS' AND CEMENT MASONS' INTERNATIONAL ASSOCIATION OF THE UNITED STATES AND CANADA, AFL-CIO, LOCAL #18, pursuant to Fed. R. Civ. P. 56.

## PRELIMINARY STATEMENT

On October 9, 2007 the third party defendant, OPCMIA Local 18, moved for summary judgment dismissing the third party complaint. Defendant opposes that motion and cross-moves for summary judgment dismissing the complaint. Defendant agrees that there are no material facts in dispute requiring a trial of this action, although disagreeing profoundly with plaintiffs and third party defendant as to which undisputed facts are material to the disposition of this case. The same grounds on which defendant opposes Local 18's motion also establish that defendant is entitled to summary judgment dismissing plaintiffs' Complaint. That, of course, will moot the third-party complaint.

## FACTS

Plaintiffs' one-count Complaint against J. P. Phillips, Inc. ("JPP") seeks delinquent contributions, liquidated damages and interest for plastering work performed by JPP employees represented by the Bricklayers Union on the State Capitol Building in Springfield, Illinois (the "Project"). (See generally Complaint). Plaintiffs are employee benefit funds established by Operative Plasterers and Cement Masons International Union ("OPCMIA") Local #18 and its signatory contractors. (Complaint at ¶2). The action is brought under the Employee Retirement Income Security Act of !974 ("ERISA"), 29 U.S.C. § 1145. (Complaint at ¶ 1).

As a result of an election conducted by the National Labor Relations Board, the International Union of Bricklayers and Allied Craftworkers, AFL-CIO ("Bricklayers") was certified by the NLRB as exclusive collective bargaining representative for JPP employees working out of JPP's place of business in Franklin Park, Illinois. After being awarded the plastering work on the Project, JPP assigned that work to Bricklayers–represented workers, as required by the NLRB certification. (Pilolla Dec. ¶3,4)

While performing work on the Project, JPP paid its employees their regular wages pursuant to its collective bargaining agreement ("CBA") with the Bricklayers ($35.50 per hour for foremen and $33.50 per hour for plasterers), rates which are significantly higher than the wage rates called for in the Local 18 CBA for the Springfield area ($26.50 per hour for foremen and $25.00 per hour for plasterers). (Pilolla Dec. ¶5). JPP checked off all union dues pursuant to its CBA with the Bricklayers and not pursuant to the PLA Local 18 Agreement. (Pilolla Dec. ¶6). JPP paid no fringe benefit contributions to Plaintiffs inasmuch as it had not assigned any work to Local 18 members. (Pilolla Dec. ¶7). However, JPP did pay fringe benefit contributions for all of its employees pursuant to its CBA with the Bricklayers. The Bricklayer fringe benefit rates were higher ($14.47 per hour) than those payable under the Local 18 CBA ($13.51 per hour). (Pilolla Dec. ¶8).

The terms and conditions of employment on construction work on the State Capitol Building were governed by a Project Labor Agreement ("PLA) between the contractors performing work on the Project and the unions providing labor to those contractors. Both OPCMIA Local 18 and the Bricklayers were parties to that agreement. In general, the PLA incorporated by reference the collective bargaining agreements of the various local union parties.

In some respects the PLA prescribed its own terms; one of those was a separate arbitration process.

In August, 2006, arbitrator Glenn Zipp in an arbitration under the PLA initiated by Local 18, decided that JPP's work on the Project should have been assigned to Local 18 instead of to the Bricklayers ("Zipp Award"). Plaintiffs are the funds created under Local 18's CBA.(Third Party Complaint ¶14,17, Complaint ¶2).

Throughout the relevant period, all construction unions, including the Bricklayers and OPCMIA, constituted the Building and Construction Department of the AFL-CIO (the "Department"). More than twenty years ago the Department and its constituent International unions established a Plan now entitled the Plan for the Settlement of Jurisdictional Disputes in the Construction Industry (the "Plan"). The Plan provides, among other things, for final and binding arbitration of all jurisdictional disputes between the constituent Internationals and their affiliated local unions. (Driscoll Dec. ¶4-9).

JPP, ("OPCMIA") together with its locals, including Local 18, and the Bricklayers International and its affiliated Locals are all bound by the Plan and required to honor and abide by an arbitrator's award under that Plan. (Exhibit D, Art. I(b). ("The procedure shall apply to all National and International Unions affiliated with the Building and Construction Trades Department, AFL-CIO, *and their local constituent bodies*) (emphasis added)); Exh. D, Art. VII, Sec. 2 ("Any decision or interpretation rendered by an arbitrator shall be immediately accepted and complied with by all parties subject to this Agreement.") Local 18's CBA also specifically binds it and its signatory contractors to the terms and provisions of the Plan. (Exhibit E, Art. II.B).

In a Plan arbitration, also decided in August, 2006, Arbitrator John McMahon, an arbitrator under the Plan, determined that the work performed by JPP at the Project should have been assigned to the Bricklayers ("McMahon Arbitration"), and that the PLA arbitration was without jurisdiction and improper. (Exhibit F).  On January 5, 2007, the OPCMIA acknowledged in writing that the decision of arbitrator Zipp had no force and effect and agreed to accept and comply with the McMahon decision.  (Exhibit G).  The OPCMIA went a step further and entered into a Federal Court Consent Order on February 14, 2007, which confirmed the McMahon Arbitration Award after reciting its directive ordering the OPCMIA and its Local Unions not to file or pursue any action to enforce the Zipp Award or to engage others to do so on their behalf. (Exh. H at page 2; Exh. F at page 2).

In 2004, in a separate, earlier Plan arbitration proceeding between Bricklayers and OPCMIA, discussed in greater detail in Point III below, a special three-arbitrator panel issued an Award that in all future jurisdictional disputes between Bricklayers and OPCMIA over plastering and cement masonry work, the employer's assignment shall prevail and the work shall be awarded to the union receiving that assignment.  (Exh.K, p. 2).

<u>ARGUMENT</u>

I.    THE NATIONAL PLAN'S ARBITRATION AWARD, CONFIRMED BY THE
      <u>FEDERAL COURT, SUPERCEDES THE LOCAL PLA'S ARBITRATION AWARD</u>

Local' 18's principal argument is that the Zipp Award under the Local PLA supercedes the contrary McMahon award under the Building and Construction Trades Department's Plan for the settlement of Jurisdictional disputes in the Construction Industry. Throughout the relevant period, all building trades International Unions were bound to that Plan, and Local Unions were also bound by virtue of their affiliation with their parent International. JPP is bound by its express written stipulation to that effect.

The Plan arbitrator awarded the work in question to the Bricklayers. The OPCMIA International accepted that Award, committed itself to comply with its terms, and expressly acknowledged that the local PLA arbitrator's decision had no force and effect, and that the Plan had jurisdiction over the dispute (Exh. G). More important, the Award was confirmed by the District of Columbia Federal Court in a Consent Order that described the Plan Arbitrator's decision as awarding the disputed work to the Bricklayers and prohibiting OPCMIA "and its Local Union" from taking any step to enforce the local PLA arbitrator's decision "pursuant to an unapproved local arbitration procedure ... or engage others to do so in their behalf." (Exh. H).

Local 18's present motion contends that the PLA award supercedes the Plan award because the PLA was signed after the parties became bound to the Plan and that the parties "contracted away" their agreement to arbitrate under the Plan when they entered into the PLA. On that premise, Local 18's Memorandum then ignores the Plan entirely and simply examines the PLA's provisions in isolation, concluding that they adequately require arbitration of the assignment dispute.

Local 18's premise is fatally flawed. The decision as to which arbitration award trumps the other cannot rest on which agreement was more recently signed. Typically, a collective bargaining agreement is of relatively short duration, generally two or three years, occasionally four or five. The Plan, although modified somewhat over the years, has been in effect for over two decades, and all construction unions, Internationals and their affiliated local unions, have been bound to it over that entire span. Invariably, therefore, the collective agreement in effect at any moment in time will have been signed after the conflicting unions first became bound to the national Plan.

Under Local 18's position, Local agreements containing their own arbitration procedures would then routinely supercede the Plan, notwithstanding the Plan's establishment on a national, permanent basis by all construction industry Unions, with known standards that are uniform throughout the United States and Canada, thus enabling jurisdictional disputes to be resolved on a consistent basis throughout the industry. The arbitration machinery of the superior bodies, the Department and its Internationals, would be nullified and superceded by that of their subordinate local affiliates, with no uniformity or consistency in adjudication standards. The Plan would thus be gutted, and the kind of jurisdictional chaos that the Plan is designed to eliminate would reappear. The economic consequences would be crippling.

Apart from the inherent fallacy in permitting the subordinate's arbitration procedure to trump that established by the superior entities, the parties to the PLA simply have no power to "contract away" the arbitration process prescribed under the Plan or remove themselves from its reach. Those local parties did not create the Plan; it was established by the Building and Construction Trades Department of the AFL-CIO and the department's affiliated International construction Unions.

Nor are the Local Unions bound to the Plan and its arbitration provisions by their own independent actions. They are bound because they are affiliates of the International Unions constituting the Building and Construction Trades Department, and the Plan so states. The parent Internationals, through the Department, have power to adopt the Plan and bind their constituent Locals, and Local 18 does not suggest otherwise. (Exh. D). There is no basis in reason or authority, for any contention that the arbitration provision of the Plan can be abrogated for a particular local project by any action or agreement on the part of local unions and their contributing contractors who did not create the Plan in the first place.

The judicial decisions, particularly in this circuit, take the opposite tack from plaintiffs' and third party defendant's position. They clearly favor the national Plan over local collective agreements as the superior forum for resolving work assignment disputes in the construction industry. Where two awards, one under the Plan, the other under a local agreement, reach conflicting results or the potential for such a conflict exists, it is the national Plan that trumps the local agreement arbitration process and an arbitration award under the national Plan that trumps an award under a local collective agreement. Sheet Metal Workers Intern. Ass'n v. Helgesteel Corp., 507 F.2d 1053, 1058 (7th Cir. 1974); Glaziers' Local Union No. 1204 v. PPG Industries, Inc., 572 F.Supp. 1092, 1092-93 (E.D. Wis. 1983); Laborers Int. Union Local 1440 v. Great Lakes Constr. Corp., 484 F.Supp.1300 (E.D. Wis. 1980).

In Helgesteel Corp., the Seventh Circuit was faced with potential conflict between arbitration awards under a local collective bargaining agreement and an award under the Building and Construction Trades National Joint Board Plan, the precursor to the present Plan. Noting that the Sheet Metal Workers' contention "would allow inconsistent final arbitration awards; the national board may say that the work should be assigned to the ironworkers while the local board has awarded damages to the sheet metal workers. We cannot accept that interpretation of the agreement. Only one forum is provided for resolving this dispute, the National Joint Board" 507 F.2d at 1508.

In Glaziers Local Union 1204 v. PPG Industries, Inc., the Court also addressed conflicting claims as to whether a work assignment dispute should be resolved under a local collective agreement or the national Plan. Emphasizing that the Plan, to which all parties were bound, specifically provided that Plan arbitration decisions must be recognized as final and binding by all affiliated National and International Unions and their affiliated Local unions, the

Court held that "the collective bargaining agreement's arbitration provision does not supercede the plan for procedure before the JJDB [the national Plan]" and that the jurisdictional dispute must be submitted to the Plan for final decision.

Local 18's Memorandum (p. 7) cites no case holding that a local collective bargaining agreement, whether or not embodied in a PLA, trumps the national Plan in the resolution of a jurisdictional dispute. Rather, Local 18 relies on general contract cases applying standard common law rules of interpretation. But these decisions are inapposite in a labor case, particularly one involving a jurisdictional dispute. The United States Supreme Court has squarely rejected the notion that "collective bargaining agreements are to be governed by the same common law principles which control private contracts between two private parties." Collective agreements, held the Court, "are not governed by the same old common-law concepts which control such private contracts...This is particularly true when the agreement is resorted to for the purpose of settling a jurisdictional dispute over work assignments." <u>Transportation-Communication Employees Union v. Union Pacific Railroad Co.</u>, 385 U.S. 157, 160-161 (1966).

The only labor case cited by Local 18 on this subject is <u>Huber, Hunt & Nichols, Inc. v. United Association, Plumbing and Pipefitting Local 38</u>, 282 F.3d 746 (9th Cir. 2002). But that decision, if at all relevant, strengthens defendant's position, not Local 18's. It did not implicate the national Plan in any way. Rather it held that a PLA arbitration procedure trumped a procedure of one of the participating Local's collective bargaining agreement. In that case, as the Court emphasized, the PLA was the broader, multi-union agreement, that existed for the purpose of "unifying dispute resolution and quelling labor strife." 282 F.3d at 755. In other words, in <u>Huber, Hunt & Nichols</u> the PLA bore the same relationship to the local agreement that in the present case the Plan bears to the PLA. The Plan is the broader, more comprehensive

vehicle for developing a coherent, permanent adjudicative process with greater reach and greater capacity for achieving "unifying dispute resolution and quelling labor strife."

## II.    THE CONFIRMED PLAN ARBITRATION AWARD MUST BE GIVEN PRECEDENCE OVER THE CONTRARY UNCONFIRMED AWARD

The Plan's Award was judicially confirmed; the PLA Award was not.  But that fact does not stand alone.  The 2004 Plan Arbitration Award decreeing that henceforth jurisdictional disputes between Bricklayers and OPCMIA over plastering work shall be determined in favor of the employer's assignment preceded both the Zipp and the McMahon awards. (Exh. K).  OPCMIA, through its General President, acquiesced in that Award and urged its acceptance by all parties, noting that the Plan itself so required.  Moreover, OPCMIA, Local 18's parent, consented to judicial confirmation of the Plan's McMahon Award dealing with this very project. (Exh. F). That federal court confirmation Order is particularly significant because the Plan Award specifically addresses the Zipp Award, repudiates its result and enjoins its implementation; and the Court's consent Confirmation Order specifically recites this fact in describing the Plan Award it was confirming. (Exh. F).

In light of the Plan award, confirmed by the Federal Court under these circumstances, it would have been a superfluous gesture for defendant to seek vacatur of the Zipp award.  Under these facts, there is no basis for concluding that the failure to so move indicated acquiescence in the Zipp award by either defendant or the Bricklayers or that this unconfirmed award can somehow supercede the confirmation Order of the federal court.

## III.    UNDER A NATIONALLY APPLICABLE PLAN ARBITRATION AWARD IN 2004, THE BASIS FOR RESOLVING JURISDICTIONAL DISPUTES BETWEEN OPCMIA AND BRICKLAYERS WAS DEFINITIVELY DECLARED, AND ONLY

## THE MCMAHON AWARD, NOT THE ZIPP AWARD, ABIDES BY THAT AWARD.

The reason why OPCMIA Local 18 invoked the PLA arbitration process and assiduously avoided the Plan is plain. In an extraordinary arbitration culminating in a decision in 2004, a Plan panel of Arbitrators laid down the principle under which future jurisdictional disputes over plastering and cement finishing work between Bricklayers and OPCMIA would be resolved. The McMahon Award adheres to that principle; the Zipp PLA Award flouts it. This history provides another critical reason why the permanent Plan procedure with uniform standards and consistent rules is preferable to innumerable potential local arbitrations with no accepted guiding standards or principles and the potential for unpredictable, inconsistent and diversified outcomes. It confirms that under the undisputed facts of this case, the rationale of the Helgesteel and Glaziers Local 1204 decisions discussed in Point I above requires that precedence be accorded the Plan Arbitration Award over the PLA Award.

To understand the relevant background, it is necessary to explain in somewhat greater detail the 2004 arbitration proceeding, its significance and its ultimate result.

In virtually all Plan proceedings, the BCTD National Plan adjudicates specific jobsite jurisdictional disputes, and generally the arbitrator's decision applies to that dispute only. The Plan, however, provides another type of proceeding in unusual, extraordinary circumstances, with a different type of award. Article X of the Plan (Exh. D). permits a more comprehensive arbitration and more sweeping award in a repetitive dispute that is disruptive to the industry or seriously jeopardizes the operational integrity of the Plan That Article deals with a repetitive dispute having widespread industrial implications and, if the parties are unable to resolve it themselves, any party may apply to have it referred to a special arbitration Panel of three. If the

Plan Administrative Committee deems the dispute worthy of Article X consideration, they approve use of that Article. Article X provides that the ensuing Panel decision shall then be recognized under the BCTD Constitution and that the decision "shall be immediately accepted and complied with by the disputing unions."

Unique among construction industry unions, Bricklayers and OPCMIA have identical craft jurisdiction: plastering and cement masonry. Thus when both Unions or their affiliates include either of these crafts in their collective bargaining agreement, neither is stepping outside its recognized craft jurisdiction.

Until about the year 1998, OPCMIA and BAC had accommodated their common craft jurisdiction over plastering and cement masonry through an agreed-upon arrangement based on geographical divisions of primacy; and this arrangement had yielded a considerable measure of jurisdictional peace for about 40 years. In 2000, OPCMIA repudiated this arrangement and began multi-state jurisdictional raids that grew into a full-fledged jurisdictional war on a national basis. (Driscoll Decl. ¶4-8).

In 2003, an affected employer sought to invoke Article X of the Plan. The Plan Administrative committee deemed the ongoing spate of disputes an appropriate subject of an Article X hearing and convened a three-arbitrator panel. (Driscoll Decl. ¶12). Demonstrating the extraordinary nature of such a proceeding, this was the first Article X case since 1978. After extensive submissions, both written and oral, by BAC and OPCMIA as well as other unions that intervened in the proceeding, the Arbitration Panel rendered the following decision:

> …All jurisdictional disputes between the BAC and the [OPCMIA] shall be resolved in favor of the work assignment of the involved Employer. Such scope is limited to cement finishing and plastering work tasks. (Driscoll Decl. ¶13, Exh. K p.2).

The Article X decision has since been applied by individual arbitrators in the more traditional type of Plan dispute and remains the guiding Plan pronouncement on the dispositive effect of employer assignment. Its terms apply directly and unequivocally to the State Capitol Building dispute. It was a resolution of the broader BAC-OPCMIA dispute; and under that decision, JPP's assignment of plastering work to BAC was determinative, as Plan Arbitrator McMahon ruled.

Pursuant to the Plan, the Article X decision "henceforth" resolving jurisdictional disputes in favor of the union to which the contractor assigns the work must be "immediately accepted and complied with by the disputing unions."[1]  The Article X decision was a binding resolution of the State Capitol Building dispute.

Thus, from the outset, upon JPP's assignment of the work to BAC, any work assignment jurisdictional dispute was foreclosed, and the PLA 's arbitration process was never applicable. That being so, neither OPCMIA itself, Local 18, nor plaintiff trustees, whose claim must necessarily rest on an applicable agreement covering plastering work at this Project, have any valid claim to payments for such work.

## IV. THE PLAN ARBITRATION AWARD VALIDATING JPP'S ASSIGNMENT OF THE WORK TO THE BRICKLAYERS EXTINGUISHES ANY CLAIM THE PLAINTIFF FUNDS MIGHT OTHERWISE HAVE HAD TO "DOUBLE PAYMENT" OF FRINGE BENEFIT CONTRIBUTIONS

As its final point, third-party defendant asserts that the plaintiff Trustees' claim is independent of the Zipp decision. That argument rests on Section 515 of ERISA, 29 U.S.C. §1145 and cases upholding claims for "double payment" against an employer having collective bargaining agreements with two unions covering the same disputed work. To be sure, there are

---

[1]  In a letter dated February 20, 2004, OPCMIA General President John Dougherty characterized the Article X decision as wise and quoted these Plan provisions in noting its dispositive effect. (Exh. A).

cases, primarily at the District Court level, to that effect. There are also several decisions by Courts of Appeal, denying recovery to Funds such as plaintiffs' when payment has already been made to the Funds of another union whose members, as here, actually performed the work. Glaziers Fund v. Gibson, 99 Fed. Appx. 740 (7th Cir. 2004); Carpenters Fringe Benefit Funds v. McKenzie Engineering, 217 F. 3d 578 (8th Cir. 2000); Trustees of BAC Local 32 Insurance Fund v. Ohio Ceiling and Partition Co., 48 Fed. Appx. 188, 2002 U.S.APP. Lexis 21095 (6th cir. 2002).

But none of the cases on which third-party defendant relies, and none of which we are aware, permits double recovery in the face of an arbitration decision awarding the work to the union to which the employer assigned it, whose members actually performed the work, and to whose benefit Funds the employer made contractually prescribed contributions.

In this Circuit, a recent Court of Appeals decision speaks directly to this point. Glaziers Fund v. Gibson, F.3d (7th Cir. 2004) (at p. 10 of its Memorandum, Local 18 cites the District Court decision.) In this case the Seventh Circuit concluded its consideration of Gibson's double payment exposure with the following statement:

> "The time to avoid paying double here was before the work was done by getting an agreement or a pre-work resolution of the dispute." (Emphasis supplied)

Id. at 742.

In short, the Seventh Circuit said, an employer burdened by two overlapping agreements and potentially competing claims by two sets of fringe benefit funds was not automatically and supinely required to pay both, although only one union's members performed all the work. If the employer was unable to obtain consensual agreement by the two unions as to which union's funds would receive the employer's contributions, its remedy was "a pre-work resolution of the dispute." The clear import of that statement is that such a "resolution of the

dispute" would absolve the employer from any obligation to contribute to the funds of the non-prevailing party.

In the construction industry, an arbitration procedure, the Plan for the Settlement of Jurisdictional Disputes in the Construction Industry, exists to determine the precise issue as to which of the two union's collective bargaining agreements shall govern the disputed work and, therefore, which union's members shall perform that work. That issue was determined here both in the 2004 Article X award and in the McMahon arbitration. Through their respective International Unions, both contesting Locals here, OPCMIA and Bricklayers are bound to the Plan, its arbitration processes, and the outcome of a Plan arbitration.

To the same effect are two companion Third Circuit decisions, also arising out of a jurisdictional dispute. In Roofers Local 30 v. Gundle Lining Construction Corporation, 1 F.3d 1429, 1430 (3d Cir. 1993) and Roofers Local 30 v. NLRB (Gundle Lining Construction Corp.), 1 F.3d 1419 (3d Cir. 1993) the Third Circuit strongly indicated that in facts analogous to those presented here, payments to one union's fringe benefit funds cannot be required when the work has been performed by another group of workers represented by another union. In the Gundle cases, following a Section 10(k) decision by the NLRB awarding the work to the Laborers Union, the Roofers Union sought to enforce an arbitration award under the Roofers agreement directing Gundle to "make whole those individuals who were deprived of work opportunities, including the payment of dues, wage and benefit fund contributions required by the labor contract" (Emphasis supplied). In its suit on that award, the Roofers Union asserted that there was a material difference "between seeking payment for work [the thrust of its arbitration award] and seeking the work itself [the issue decided in the 10(k) proceeding]." 1 F.3d at 1430.

The Third Circuit squarely rejected that contention, holding that "The distinction Local 30 seeks to draw between seeking the work and seeking payment for the work is ephemeral." 1 F.3d at 1427. The Plan Arbitrator's award herein serves the same purpose as the NLRB 10(k) decision in <u>Gundle</u>. It is a resolution of the dispute that precludes any effort to secure fringe contributions based on work performed by others.

In sum, plaintiffs' claim against defendant rests on the same basic question considered above, with respect to third party defendants motion for summary judgment: does Plan Arbitrator McMahon's judicially confirmed Award trump PLA Arbitrator Zipp's contrary, unconfirmed Award. For all the reasons set forth above, we believe it clearly does. That being so, plaintiffs' entire case falls, and defendant's cross-motion for summary judgment should be granted. As noted at the outset of this Memorandum, that in turn would moot the third-party complaint and the third-party defendant's motion for its dismissal.

CONCLUSION

For all the foregoing reasons, we respectfully urge that defendant's motion for summary judgment against Plaintiff's be granted, and that upon such grant the third-party complaint be dismissed as moot.

Respectfully Submitted,

**J.P. Phillips, Inc.**

By: /S/ Stanley E. Niew
One of its Attorneys

STANLEY E. NIEW
NIEW LEGAL PARTNERS
600 Hunter Drive, Suite 310
Oak Brook, Illinois 60523
(630) 586-0110 phone
(630) 586-0120 fax
Attorney # 6286810

**E-FILED**
Friday, 02 November, 2007  01:51:38 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT

# A

FEB-20-.004 10:23AM    FROM-OPCMIA GENERAL PRES OFFICE    +    T-437  P.002/003  F-234



February 20, 2004

<u>**VIA FACSIMILE AND FIRST CLASS MAIL**</u>

Mr. Richard M. Resnick
Administrator and Counsel to the Plan
Plan for the Settlement of Jurisdictional
  Disputes in the Construction Industry
1125 Fifteenth Street, N.W., Suite 801
Washington, D.C. 20005

Dear Mr. Resnick:

This letter will respond to the appeal of the BAC to the JAC from the decision of the Article X Arbitration Panel issued February 11, 2004. It is the position of the OPCMIA that the National Arbitration Panel decision is final and binding, and not subject to appeal to the JAC. If the JAC should consider this appeal, we urge that it be summarily denied.



**John J. Dougherty**
GENERAL PRESIDENT
●
Affiliated with
American Federation
of Labor and
Congress of Industrial
Organizations
●
Union Label and Service
Trades Department
●
Metal Trades
Department
●
Maritime Trades
Department
●
Canadian Labour
Congress

Article X does not provide the parties with the right to appeal the decision of the Article X National Arbitration Panel. This was no mere oversight. The Plan for the settlement of jurisdictional disputes in other provisions of the Plan allows for limited appeals. See Article V, Section 14, which establishes that an appeal of a decision of a single plan arbitrator can be made on the basis that the arbitrator failed to address the established criteria of Article V, Section 8. Nor is this limited appeal a matter of right. Section 14 provides that "If a majority of the JAC does not wish to consider the appeal, the decision shall be final and binding…" The absence of even limited appeal rights in Article X leads to the inescapable conclusion that decisions of the National Arbitration Panel are final and binding with no right of appeal. That was certainly the view of Arbitrator Douglas, a member of the National Arbitration Panel, who stated during the hearing: "Implicit in the word arbitration is final." Counsel for the BAC readily agreed with Arbitrator Douglas: "It is final for the purposes of this arbitration." To allow an appeal to a decision of the National Arbitration Panel would require a rewriting of the Plan, which the BAC has argued forcefully should not be allowed.

The stated grounds for the appeal clearly lack merit. Having advocated to the National Arbitration Panel that "extraordinary circumstances call for extraordinary remedies;" and that "Article X is there to deal with the broader problem which may involve broader solutions," the BAC cannot be taken seriously in its lament that the Panel has exceeded its authority in its remedy.





EXHIBIT

A

14405 Laurel Place ● Suite 300 ○ Laurel, Maryland 20707    (301) 470-4200

FEB-20 2004  10:23AM   FROM-OPCMIA GENERAL PRES OFFICE          +          T-437  P.003/003  F-234

- 2-

The National Arbitration Panel was careful to delineate its authority under the Plan and it was mindful **not** to rewrite the Plan. President Flynn has misstated the effect of the Decision of Record. It does not nullify previous agreements of record between the Internationals. As set forth in Article V, Sections 8(a) and (b), agreements of record will continue to be the first and paramount criteria for resolving jurisdictional disputes. Only if there is no applicable agreement of record will Plan arbitrators turn to Decisions of Record.

While neither International was completely successful in obtaining the remedies that they proposed to the National Arbitration Panel, the OPCMIA repeatedly stressed to the National Arbitration Panel that locality practice under the Plan had become distorted and confused because of the prior maps. Arriving at a determination of locality practice, when for example, the work in a particular area was historically performed by OPCMIA members working under a BAC agreement was a meaningless exercise. Under these circumstances, the National Arbitration Panel wisely concluded that employer assignment of the work should prevail.

The outcome of the Article X National Arbitration Panel proceedings is not everything that the OPCMIA desired, but all parties must live with the result. Article X states that "Decisions of the National Arbitration Panel shall be immediately recognized under the provisions of the Constitution of the Department and Article IX of this Plan." Article IX states that affiliated unions "Shall comply with the decisions and rulings of the… National Arbitration Panels established hereunder." Article X further provides that, "Decisions of the National Arbitration Panel shall be immediately accepted and compiled with by the disputing unions."

We can understand that President Flynn must be disappointed that the proceeding that he fought so hard to invoke did not render a decision to his liking. However, the well-reasoned decision of the National Arbitration Panel was arrived at after a thorough review of a voluminous record that included hundreds of pages of briefs, thousands of pages of exhibits and affidavits and oral argument of the affected parties. We urge the JAC to rule that the BAC has no right or basis to appeal the final decision of the National Arbitration Panel. It is time to move on.

Sincerely,

John J. Dougherty
General President



JJD/lc
cc:   John J. Flynn, President BAC
      Terence M. O'Sullivan, General President LIUNA

# EXHIBIT

# C

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

IN THE MATTER OF ARBITRATION                                  OPINION
                    Between
INTERNATIONAL UNION OF BRICKLAYERS and                       AND
ALLIED CRAFT WORKERS, AFL-CIO
                    And                                       DECISION
OPERATIVE PLASTERERS' & CEMENT MASONS'
INTERNATIONAL ASSOCIATION OF THE UNITED
STATES AND CANADA, AFL-CIO
                    And
LABORERS' INTERNATIONAL UNION OF NORTH
AMERICA

                    (As Intervenor)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

A hearing regarding this arbitration was held on January 28, 2004, at 10:00 am, at the AFL-
CIO building located at 815 16th Street, N.W., Washington, D.C.  The undersigned
arbitrators were appointed to hear the case by the Joint Administrative Committee
established under the provisions of the Plan For The Settlement Of Jurisdictional Disputes
In The Construction Industry. At the conclusion of the hearing the record was closed by the
arbitrators.

## APPEARANCES

For the International Union of Bricklayers and
Allied Craft Workers, AFL-CIO
                                                 Seymour M. Waldman

For the Operative Plasterers' & Cement Masons'
International Association of the United States
and Canada, AFL-CIO

                                                 Brian A. Powers

For the Laborers' International Union of
North America

                                                 Gregory A. Davis

EXHIBIT

C

1

<u>ISSUE</u>

The parties to the arbitration were unable to frame and stipulate to an issue.  The undersigned arbitrators therefore state the issue as:

> " What is an appropriate remedy within the province of the Plan For The Settlement Of Jurisdictional Disputes In The Construction Industry Including Procedural Rules And Regulations, that will serve to alleviate the continuing jurisdictional disputes between the International Union of Bricklayers and Allied Craft Workers, AFL-CIO, and the Operative Plasterers' & Cement Masons' International Association of the United States and Canada, AFL-CIO, that have been declared by the Joint Administrative Committee to be disruptive to the industry?"

<u>FACTUAL FINDINGS</u>

The Joint Administrative Committee (hereinafter referred to as JAC) established under Article III of the Plan For the Settlement Of Jurisdictional Disputes In The Construction Industry (hereinafter referred to as Plan) reviewed, under the provisions of Article X of the Plan, the record of jurisdictional disputes between the International Union of Bricklayers and Allied Craft Workers, AFL-CIO (hereinafter referred to as BAC) and the Operative Plasterers' & Cement Masons' International Association of the United States and Canada, AFL-CIO (hereinafter referred to as OPCM). The JAC determined that the jurisdictional disputes between BAC and OPCM are repetitive and disruptive to the industry. The JAC, under Plan Article X Sec. 2.(c) referred the matter to BAC and OPCM for a period of 90 days to endeavor to reach a national agreement governing future jurisdiction. The BAC and OPCM failed to reach an agreement and further to the provisions of Plan Article X the dispute was referred to a National Arbitration Panel (hereafter referred to as Panel) made up of the below signed arbitrators.

The Laborers' International Union of North America (hereinafter referred to as LIUNA) was determined by the JAC to be a directly affected party to the dispute and allowed to intervene. The Panel agreed with the parties on a briefing schedule and a hearing date. The parties filed a voluminous amount of briefs and declarations, reply briefs and rebuttal declarations and surrebuttal declarations. All of these writings were reviewed by the Panel between November 13, 2003 and January 21, 2004, in preparation for the hearing of January 28, 2004. Each of the parties offered oral arguments at the hearing and the proceedings were transcribed.

2

<u>OPINION</u>

As a threshold matter, the Panel is confronted with the question of the breadth of Its authority under the Article X Panel proceedings. The BAC has argued that Article X imposes no restrictions whatsoever on the Panel's authority to craft a remedy. BAC implies that the Panel may disjoin Article X from the four corners of the Plan and Its Procedural Rules And Regulations (hereinafter referred to as Rules) and apply any decision or award that the Panel sees as fit. In this regard BAC has asserted that NLRB representational issues cannot be separated from jurisdictional issues.

A careful reading of the Plan/Rules reveals that Article X is actually constructed to support the intent and purpose of the Plan/Rules and Article X does in fact incorporate by expressed reference, specific provisions of the Plan/Rules. Article X contains the term "dispute" 12 times within Its body of Sections. This reference to disputes must be read in context with the overall Plan/Rules. The term "dispute" is not a catchall to be used for any purpose. Various parts of the Plan/Rules support this contention.

> "•••It is a violation of the Plan for the contractor to hold up disputed work or shut down a project because of a <u>jurisdictional dispute (Panel emphasis)</u> •••"
> (Page 3. Rules)

> "•••during the existence of the Plan there shall be no strikes, work stoppages, or picketing arising out of any <u>jurisdictional dispute (Panel emphasis)</u>•••"
> (Page 4. Rules)

> "•••where an issue is a case, dispute or controversy involving a <u>jurisdictional dispute (Panel emphasis)</u>•••"
> (Page 5.- 6. Rules)

> "•••The parties to this Agreement dedicate their efforts to improving the construction industry by providing machinery for the handling of <u>disputes over work assignments (Panel emphasis)</u>•••"
> (Page 14. Plan)

> "<u>Resolution Of Jurisdictional Disputes (Panel emphasis)</u>"
> (Page 19. Plan)

3

> "•••A <u>jurisdictional dispute</u> (<u>Panel emphasis</u>) is defined
> as a dispute between unions over the assignment of
> work and in which the Employer has an interest•••."
> (Page 31. Plan)

This sampling of Plan/Rules language unequivocally establishes that the purpose of Plan/Rules is to address the issue of jurisdictional work assignment disputes. There is no evidence that would support an expansion of Article X to address anything beyond jurisdictional disputes. For this reason the Panel rejects the arguments and requests of the parties regarding the following:

- An order to merge the BAC and OPCM.

- An order providing some measure of Plan authority over the operation and administration of Local Building & Construction Trade Councils.

- An order providing some measure of Plan authority over the Project Labor Agreement Committee of the Building & Construction Trades Department, AFL-CIO.

- An order providing some measure of Plan authority over ERISA trust fund collection lawsuits involving BAC and OPCM.

- An order providing some measure of Plan authority over the distribution of BAC and OPCM working dues.

- An order providing some measure of Plan authority over NLRB election petitions regarding BAC and OPCM.

It is the opinion of the Panel that the subject of the reinstatement of the prior Map System, or the creation of a new Map System is within the authority of the Panel. After review of the evidence and arguments made by the parties however, it is clear to the Panel that a Map System will not provide resolution to the jurisdictional disputes giving rise to this arbitration.

# EXHIBIT

# D

## PLAN FOR THE SETTLEMENT OF JURISDICTIONAL
## DISPUTES IN THE CONSTRUCTION INDUSTRY

### PREAMBLE

This Agreement is entered into by and among the Building and Construction Trades Department, AFL-CIO, on behalf of its constituent National and International Unions (referred to hereinafter as the Department) and the Employer Associations signatory to this Agreement (referred to hereinafter as the Employer Associations).

The parties to this Agreement dedicate their efforts to improving the construction industry by providing machinery for the handling of disputes over work assignments without strikes or work stoppages thus stabilizing employment in the industry at the same time increasing both its efficiency and capacity to furnish construction services to the public at reasonable cost.

### ARTICLE I

### SCOPE OF APPLICATION

The procedure shall apply to:

(a)    Employers who employ members of the organizations affiliated with the Department and who have signed a stipulation setting forth that they are willing to be bound by the terms of this Agreement or who are members of a stipulated association of employers with authority to bind its members, or who are parties to a collective bargaining agreement providing for the settlement of jurisdictional disputes under these procedures herein set forth or any predecessor Plan.

The essence of this Plan assumes voluntary participation. National Employer Associations shall encourage participation in this Plan by their chapters and members, but no contractor stipulation or agreement shall be recognized by the Administrator if it is shown to the satisfaction of the Administrator that it is the result of unlawful strikes, work stoppages or other coercive activity or any activity which is contrary to the voluntary nature of this Plan, by a labor organization affiliated with the Department. Notwithstanding any other provision of this Plan should such action be taken against any chapter or member of any participating Employer Association to compel stipulation to the Plan, its parent association, if it is signatory to this Plan, shall thereby have the option to terminate its participation upon written notice to the Administrator within thirty (30) days of such action or occurrence, provided that notice of the action or occurrence has been afforded to the Department by the parent association during the thirty (30) day period and prior to any notice of termination.



EXHIBIT

(b)    All National and International Unions affiliated with the Building and Construction Trades Department, AFL-CIO, and their local constituent bodies.

## ARTICLE II

## STIPULATION PROCEDURE

Sec. 1.  The Department of National and International Unions affiliated with the Department shall, in accordance with their constitutional powers, request each of the Building and Constructions Trades Department Councils, District Councils and Local Unions, respectively:

(a)    To secure written assent or stipulation to the Plan for the Settlement of Jurisdictional Disputes in the Construction Industry by all Employers in signed agreement with said National or International Union, Council and/or Local Union except for such Employers who are stipulated to the Plan by the action of the Employer Association of which they are members; or

(b)    To proceed at the earliest opportunity to negotiate stipulation to the Plan into all agreements with each employer whose employees are represented by such Building Trades Council, District Council or Local Union.

Sec. 2.  All Employer Associations shall seek to have their local chapters stipulate their membership to the Plan for the Settlement of Jurisdictional Disputes in the Construction Industry unless the national Employer Association has made such stipulation on behalf of its membership.  In the event a local chapter refuses to stipulate, the national association shall notify the Joint Administrative Committee of the negative action of the specific local chapter and/or the individual member.

Sec. 3.  It is understood that only those Employers or Employer Associations who employ members of the organizations affiliated with the Department shall be considered bound by this Agreement when they have signed a stipulation setting forth that they are willing to subscribe to and be bound by the terms and provisions of this Agreement.

## ARTICLE III

## JOINT ADMINISTRATIVE COMMITTEE

Sec. 1.  There shall be established a Joint Administrative Committee (hereinafter referred to as the "JAC"), to oversee the operation of the Plan.

Sec. 2.  The JAC representing the Department and the signatory Employer Associations shall consist of eight (8) voting members, four (4) nominees from the Department and four (4) from the Employer Associations.  There shall be a Chairman

and a Vice-Chairman of the JAC.   The Chairman shall be the President of the Department.   The Vice-Chairman shall be designated by the signatory Employer Associations.   The Chairman and the Vice- Chairman shall be non-voting members of the Committee.

Sec. 3.  The JAC shall appoint two Administrators of the Plan. One Administrator shall handle all matters arising in the United States.  The second Administrator shall handle all matters arising in Canada.  References to the Administrator in this Agreement and the Procedural Rules shall mean the appropriate U.S. or Canadian Administrator. The Administrator shall be compensated at a rate and under terms to be established by the JAC.

Sec. 4.   The Administrator shall be bonded and made responsible for disbursement of the funds, shall keep the books of the Plan and submit to parties to the Agreement a quarterly financial statement; shall provide for an annual audit of the books by a certified public accountant and shall prepare annually a proposed budget of the necessary expenses of the Plan for the following twelve (12) months and submit same to the JAC for approval.  The total amount of the budget, when approved, shall be subscribed annually in advance, 50 percent by the Department and 50 percent by the signatory Employer Associations.  All expenditures shall be within the approved budget.  In order to assure adequate funding of the Plan, the JAC may establish a schedule of fees to be charged to parties wishing to utilize the services of the Plan but who are not affiliated with any of the organizations signatory to this Agreement.

## ARTICLE IV

## RULES AND REGULATIONS

Sec. 1.  The Administrator shall adapt his operations to assure that all cases submitted shall be disposed of as expeditiously as possible.

Sec. 2.  The Administrator, with the prior approval of the JAC, shall establish such procedural regulations and administrative practices as may be required for the effective administration of this Agreement, provided such regulations and practices are consistent with the expressed terms of this Agreement.

Sec. 3.  The JAC shall have the power to revise the procedural regulations and administrative practices of the Administrator.  The Administrator shall promptly notify all parties to the Plan of any revisions in the procedural or administrative practices.

Sec. 4.  The Administrator shall keep records of disputes and decisions and develop such statistical and operational information as may be of value to the JAC.  The Administrator shall from time to time make recommendations to the JAC for changes in the procedural rules or provisions of the Plan which will strengthen and improve the effectiveness of the Plan.

12

Sec. 5.  It shall be the duty of the Administrator to process cases of jurisdictional disputes in the Building and Construction Industry when disputes are referred to him by any of the National and International Unions involved in the dispute, or an Employer directly affected by the dispute on the work in which he is engaged or by the signatory Employer Association representing such Employer.  The Administrator shall only process cases in which all parties to the dispute are stipulated to the Plan in accordance with Article II or, upon the filing of a dispute, become stipulated to the Plan in accordance with Article II.  In the Administrator's sole discretion, the issue of stipulation may be submitted to an Arbitrator.  The Arbitrator shall be bound to apply the same terms of the Plan and the Procedural Rules regarding stipulation as the Administrator.

Sec. 6.  If the responsible contractor is not stipulated to the Plan, any of the National and International Unions involved in a dispute with the contractor may file a statement with the Plan Administrator indicating that, if the contractor had been stipulated to the Plan, the Union would have filed a jurisdictional dispute pursuant to Article V of the Plan.  The notice shall include the unions involved, a description of the work in dispute, the name and location of the project, the name of the responsible contractor, the assignment that was made by the contractor and which of the Article V, Section 8, criteria the Union contends supports its claim to the work.   The Plan Administrator shall compile a list of such statements and distribute it to the parties to the Plan monthly.

Sec. 7.  In the interest of expediting resolutions of jurisdictional disputes, the Administrator shall undertake to keep a record of decisions involving the same type of dispute and involving the same trades and report such record quarterly to the JAC.

## ARTICLE V

### RESOLUTION OF JURISDICTIONAL DISPUTES

Sec. 1.  When a dispute over an assignment of work arises, the National or International Union challenging the assignment, or the Employer directly affected by the dispute or the signatory Employer Association representing such Employer shall notify the Administrator in writing, with copies to the other parties to the dispute.  The notice shall include a statement whether representatives of the National and International Unions have met or attempted to meet with the local parties to attempt to resolve the matter.  For disputes in the United States, if the National and International Unions involved in the dispute voluntarily agree to mediation, the notice shall so advise the Administrator.  The mediation may be used in lieu of the meeting of the International Representatives.

Sec. 2.  Upon receipt of said notice, the Administrator or his designee shall notify within two (2) days by facsimile all directly affected National and International Unions

13

and employers that a dispute exists between the local parties. The Administrator shall also provide notice of the dispute to all other National and International Unions party to this Agreement. At the same time, if the National and International Unions involved in a dispute in the United States have consented to voluntary mediation, the Administrator shall contact the Federal Mediation and Conciliation Service and request the appointment of a mediator to assist the parties in the local area in settling the dispute. The mediator shall have three (3) days from the date the matter is referred by the Administrator to mediate the dispute. The mediator shall submit by facsimile a report to the parties and the Administrator indicating whether the dispute has been resolved no later than the end of the three (3) day period. The report of the mediator shall not be submitted to a Plan Arbitrator.

Sec. 3. If the respective National and International unions of the disputing locals and the directly affected Employer are unable to resolve the dispute, any of the directly affected parties may request arbitration of the dispute, within five (5) days, from the date the matter is referred by the Administrator, by filing a notice to arbitrate with the Administrator, with copies to all directly affected parties. The Administrator will only honor a request to submit the matter to arbitration prior to the expiration of the five (5) day period if the requesting party has demonstrated that the International Representatives have met or attempted to meet with the local parties to resolve the matter or have been through the mediation process set forth in Section 2.

Sec. 4. Upon receipt of said notice, the Administrator shall send to all directly affected parties a list of impartial arbitrators knowledgeable about the construction industry, chosen by the JAC.

Sec. 5. The directly affected National and International Unions and the responsible contractor(s) will each have three days in which to cross off the name of one arbitrator to which it objects, number the remaining names to indicate the order of preference and return the list to the Administrator. If a party does not return the list within the time specified, all persons named therein shall be deemed acceptable. From among the persons who have been approved on each party's list, and in accordance with the designated order of mutual preference, the Administrator shall notify the parties of the arbitrator selected. If the parties are unable to select an arbitrator, the Administrator shall appoint the arbitrator.

Sec. 6. Upon his selection the Arbitrator, with the assistance of the Administrator, shall set and hold a hearing within seven (7) days. The Administrator shall notify the employer, and the appropriate National and International Unions and Employer Associations by facsimile of the place and time chosen for the hearing. Said hearing shall be held in Washington, D.C. or, for a dispute arising in Canada, in Eastern, Central or Western Canada as determined by the Administrator. A failure of any party or parties to attend said hearing without good cause, as determined by the

14

Administrator, shall not delay the hearing of evidence or issuance of a decision by the Arbitrator.

Sec. 7. The Arbitrator shall issue his decision within three (3) days after the case has been closed. The decision of the Arbitrator shall be final and binding on all parties to the dispute.

Sec. 8. In rendering his decision, the Arbitrator shall determine:

a) First whether a previous agreement of record or applicable agreement, including a disclaimer agreement, between the National or International Unions to the dispute governs;

b) Only if the Arbitrator finds that the dispute is not covered by an appropriate or applicable agreement of record or agreement between the crafts to the dispute, he shall then consider whether there is a previous decision of record governing the case;

c) If the Arbitrator finds that a previous decision of record governs the case, the Arbitrator shall apply the decision of record in rendering his decision except under the following circumstances. After notice to the other parties to the dispute prior to the hearing that it intends to challenge the decision of record, if a trade challenging the decision of record is able to demonstrate that the recognized and established prevailing practice in the locality of the work has been contrary to the applicable decision of record, and that historically in that locality the work in dispute has not been performed by the other craft or crafts, the Arbitrator may rely on such prevailing practice rather than the decision of record. If the craft relying on the decision of record demonstrates that it has performed the work in dispute in the locality of the job, then the Arbitrator shall apply the decision of record in rendering his decision. If the Arbitrator finds that a craft has improperly obtained the prevailing practice in the locality, through raiding, the undercutting of wages or by the use of vertical agreements, the Arbitrator shall rely on the decision of record rather than the prevailing practice in the locality;

d) If no decision of record is applicable, the Arbitrator shall then consider the established trade practice in the industry and prevailing practice in the locality; and

e) Only if none of the above criteria is found to exist, the Arbitrator shall then consider that because efficiency, cost or continuity and good management are essential to the well being of the industry, the interests of the consumer or the past practices of the employer shall not be ignored.

The Arbitrator shall set forth the basis for his decision and shall explain his findings regarding the applicability of the above criteria. If lower-ranked criteria are relied upon, the Arbitrator shall explain why the higher-ranked criteria were not deemed applicable. The Arbitrator's decision shall only apply to the job in dispute.

15

Sec. 9.  Agreements of record are applicable only to the parties signatory to such agreements.  Decisions of record are applicable to all trades.

Sec. 10.   The Arbitrator is not authorized to award back pay or any other damages for a misassignment of work.   Nor may any party to this Plan bring an independent action for back pay or any other damages, based upon a decision of an Arbitrator.

Sec. 11.   Each party to the arbitration shall bear its own expense for the arbitration and agrees that the fees and expenses of the Arbitrator shall be borne by the losing party or parties.  An administrative fee, in accordance with the fee schedule established by the JAC, shall be paid to the Plan by the affected employer(s) if the employer(s) is not affiliated with any of the organizations signatory to this Agreement.

Sec. 12.   Any party to a dispute that has been arbitrated that believes the Arbitrator failed to address the established criteria of Article V, Section 8, may request the JAC to consider an appeal.  No appeal may be processed unless the Arbitrator's decision has been implemented.

Sec. 13.   A request to consider an appeal from a final decision of a Plan Arbitrator shall be filed with the Administrator, with copies to the other parties to the dispute, within five days of the date the Administrator transmitted the Arbitrator's decision.  The request to consider an appeal shall include a copy of the Arbitrator's decision being appealed and a statement describing the basis of the claim that the Arbitrator failed to address the established criteria of Article V, Section 8.  The other parties to the dispute shall have three days to submit to the Administrator, with copies to the other parties, a response to the request for appeal.

Sec. 14.   Once the submissions of the parties are complete, the Administrator shall distribute copies of the appeal to the members of the JAC that are not parties to the dispute.  Within five days from receipt of the submissions, each member of the JAC shall notify the Administrator whether the appeal should be heard.  If a majority of the JAC does not wish to consider the appeal, the decision of the Arbitrator shall be final and binding.  If a majority of the JAC members believes the appeal has merit, the Administrator shall arrange for a meeting of the JAC, which may be by telephone conference, to consider the appeal.  The sole issue to be considered on appeal is whether the Arbitrator failed to address the established criteria of Article V, Section 8.

Sec. 15.   If the JAC determines that the Arbitrator failed to address the established criteria of Article V, Section 8, it shall remand the case to the Administrator to process for a hearing before a new Plan Arbitrator.

16

ARTICLE VI

CONTINUATION OF WORK

Sec. 1.  During the existence of this Agreement, there shall be no strikes, work stoppages or picketing arising out of any jurisdictional dispute.  Contractors and subcontractors shall make work assignments in accordance with the Obligations of the Employers as set forth in Article IX, and the Rules and Regulations of the Administrator. Members of organizations affiliated with the Department shall continue to work on the basis of their original assignment.

Sec. 2.  Recognizing that it is in the best interests of the parties to this Agreement, the Department, on behalf of itself and the General Presidents of each of the affiliated National and International Unions, reaffirms its desire to eliminate work stoppages, slowdowns and other impediments to job progress and its intent to comply with the provisions of the Plan prohibiting jurisdictional strikes and agrees to enforce these provisions by direction and action of their respective National or International offices.  In the event of a work stoppage, slowdown or other impediment to job progress, the employer may take the following course of action:

(a) The employer shall notify the Administrator or his designee of the alleged breach of this Article.  Notice to the Administrator shall be by the most expeditious means available, with simultaneous notice by facsimile to the party alleged to be in violation and the involved National or International Union President(s).  The International President(s) will immediately instruct, order and use the best efforts of his office to cause the local union or unions to cease any violation of this article.  A National or International Union complying with this obligation shall not be liable for unauthorized acts of its local union.

(b) Upon receipt of said notice, the Administrator or his designee shall select an arbitrator from a panel of arbitrators chosen by the JAC.

(c) Upon his selection, the Arbitrator shall hold a hearing within 24 hours if it is contended that the violation still exists.

(d) The Arbitrator, with the assistance of the Administrator, shall notify the employer, the local union(s), and the appropriate National or International Union(s) and Employer Association(s) by facsimile of the place and time he has chosen for this hearing.  Said hearing shall be held in Washington, D.C. or, for a dispute arising in Canada, in Eastern, Central or Western Canada as determined by the Administrator, and shall be completed in one session.  A failure of any party or parties to attend said hearing shall not delay the hearing of evidence or issuance of a decision by the Arbitrator.

17

(e) The sole issue at the hearing shall be whether or not a violation of this Article has in fact occurred, and the Arbitrator shall have no authority to consider any matter in justification, explanation or mitigation of such violation or to award damages.    The Arbitrator's decision shall be issued in writing within 3 hours after the close of the hearing, and may be issued without an opinion.    If any party desires an opinion, one shall be issued within 15 days, but its issuance shall not delay compliance with, or enforcement of, the decision.    The Arbitrator may order cessation of the violation of this Article and other appropriate relief, and such decision shall be served on all parties by facsimile upon issuance.

(f) The Arbitrator's decision may be enforced by the United States District Court for the District of Columbia or, for a dispute arising Canada, the appropriate Canadian court as determined by the Administrator, upon the filing of this agreement and all other relevant documents in the following manner: Any National or International Union, Employer or Employer Association whose affiliate was a party to the arbitration proceeding may notify the Administrator of the failure of any party to abide by the Arbitrator's decision.    A copy of the notice shall be sent simultaneously to all other parties to the arbitration proceeding and appropriate National or International Union(s), Employer(s) and Employer Association(s).    If the Administrator determines that the Arbitrator's decision is not being implemented, he shall proceed to obtain a temporary order enforcing the Arbitrator's decision.    Facsimile notice of the filling such enforcement shall be given to all directly affected parties.

(g) All parties signatory or stipulated to this agreement, consent to the jurisdiction of the United States District Court for the District of Columbia or, for a dispute arising in Canada, the appropriate Canadian court as determined by the Administrator, for the purposes of enforcement of an arbitration decision rendered under this Article.    In addition, in the proceedings to obtain a temporary order enforcing the arbitration decision, all parties to this agreement waive the right to a hearing and agree that such proceedings to enforce an arbitrator's decisions may be ex parte.    Such agreement does not waive any party's right to participate in a hearing for final order of enforcement.    The court's order(s) enforcing the Arbitrator's decision shall be served on all interested parties by hand, by facsimile, by delivery to their last known address or by registered mail.

(h) Any rights created by statute or law governing arbitration proceedings inconsistent with the above procedure or which interfere with compliance therewith are hereby waived by the parties to whom they accrue.

(i) Each party to the arbitration shall bear its own expense for the arbitration and agrees that the fees and expenses of the Arbitrator shall be borne by the losing party or parties.    A party notifying the Administrator of the failure of another party to abide by an arbitrator's decision, shall be responsible for the ongoing attorneys' fees, court costs and expenses incurred by the Administrator in seeking to enforce the

arbitrator's decision. The notifying party shall thereafter be reimbursed for any such attorneys' fees, court costs and expenses incurred by the Administrator by the party failing to abide by the Arbitrator's decision.

## ARTICLE VII

### ENFORCEMENT

Sec. 1. When the JAC has determined that an Employer or National or International Union is in violation of this Agreement, such Employer or National or International Union shall be denied a representative on any committee established by this Agreement during the period of violation, provided, however, that in accordance with Article IV, Section 5, an Employer who is not stipulated to this Plan shall not be entitled to resolution by an arbitrator of any dispute in which he is involved or to invoke any sanctions against any National or International Union.

Sec. 2. Any decision or interpretation rendered by an arbitrator shall be immediately accepted and complied with by all parties subject to this Agreement. If a party fails to accept and comply with a jurisdictional decision of an arbitrator or a ruling of the Administrator or the JAC, the Administrator may, with the approval of the JAC, proceed in the same manner as the enforcement of an arbitrator's decision set forth in Section 2 (f)-(i) of Article VI.

Sec. 3. It shall be a violation of this Agreement for any Local, National or International Union, Employer or Employer Association signatory or stipulated to this Agreement, to enter into any agreement, resolution or stipulation that (a) attempts to establish any jurisdiction which deviates from the spirit and intent of the Agreement and Rules and Regulations of the Plan; or (b) permits jurisdictional disputes between affiliates of the Department to be resolved by a single craft labor-management committee, provided the dispute involves stipulated contractors and can be processed under this Plan.

## ARTICLE VIII

### LOCAL BOARDS

Sec. 1. In any community or locality where a plan for the settlement of jurisdictional disputes has been recognized by the Department, it shall be used in the first instance to bring about an agreement, settlement or decision. However, any such local settlement, agreement or decision may be appealed by any of the involved parties in accordance with Section 2 and 3 of this Article.

Sec. 2. The Administrator is empowered to refer to arbitration, in accordance with Article V, Sections 5-10, any appeal from a decision or ruling of a Local Board

recognized under Section 1. The authority of the Administrator to refer a case to arbitration shall be discretionary. The Administrator is authorized, subject to the prior approval of the JAC, to prescribe rules as to the types of cases he will refer to arbitration.

Sec. 3. The Administrator shall have the authority to establish such procedural regulations and administrative practices as may be required for the effective administration of this appeals procedure, subject to the prior approval of the JAC.

## ARTICLE IX

## OBLIGATIONS OF THE PARTIES

To the end that proper assignments of work are made by the Employer involved and that jurisdictional disputes between unions are settled under the terms of the Plan without interruptions of work, it is therefore agreed as follows:

Sec. 1. Obligations of the Employer

(a) Each Employer or Employer Association stipulated to this Plan agrees that all cases, disputes or controversies involving jurisdictional disputes or assignments of work arising under this Agreement shall be resolved as provided herein, and shall comply with the decisions and rulings of the Administrator, the JAC, arbitrators or National Arbitration Panels established hereunder. A jurisdictional dispute is defined as a dispute between unions over the assignment of work and in which the Employer has an interest.

(b) Each Employer agrees that he shall continue to make work assignments in accordance with Article V, Section 8 and the Rules and Regulations of the Administrator. Continued misassignments by an Employer, as determined by the Administrator, shall be reported to the JAC which shall take such procedural or legal action against such Employer as it deems necessary and proper to effectuate the purposes of this Agreement.

(c) All participating Employer Associations shall inform their stipulated members, in writing, of their responsibility for the assignment of work in accordance with the Rules and Regulations of the Administrator.

(d) All participating Employer Associations shall encourage inclusion of work assignment training in all supervisory training programs.

(e) Each Employer who is bound by this Plan will use his best efforts to assure compliance with its terms by subcontractors engaged by the Employer on any construction job covered by the Plan.

Sec. 2.  Obligations of the Department and its Affiliated Unions

(a) The Department and each of its affiliated unions agree that all cases, disputes or controversies involving jurisdictional disputes and assignments of work arising under this Agreement shall be resolved as provided herein, and shall comply with the decisions and rulings of the Administrator, the JAC, arbitrators or National Arbitration Panels established hereunder.

(b) The Department and each of its affiliated National and International Unions agree that the establishment of picket lines and/or the stoppage of work by reason of an Employer's assignment of work are prohibited.  No Local Union of an affiliated National or International Union shall institute or post picket lines for jurisdictional purposes.

(c) In the event of a jurisdictional dispute, resulting in a work stoppage, strike, picket line or other interference of the work, a report of that fact shall be made by the Employer and/or the National or International Union immediately to the Administrator, to the Building and Construction Trades Department and to the appropriate Employer Association office for processing in accordance with Article VI of the Plan.

(d) In the event pickets are posted by any local trades council or any local of a National or International Union affiliated with the Department for jurisdictional purposes, the Department will immediately direct all National and International Unions to advise their affiliates to ignore such picketing and to continue to work.  If in contravention of this Plan a jurisdictional work stoppage should occur, it is the intent of this Article that the work shall continue with the crafts cooperating to the maximum extent possible to enable job continuity.

(e) The Administrator shall send a monthly report to each General President, the President of the Department and to the executive heads of the signatory Employer Associations setting forth all information on jurisdictional disputes for that month.  The report should include the location and job where the dispute occurred, the parties involved, the subject of the dispute and shall indicate whether any stoppage occurred or picket lines were established.

## ARTICLE X

## NATIONAL ARBITRATION PANEL

Sec. 1.  National Arbitration Panels shall be established hereunder and shall be composed of three arbitrators, knowledgeable in the construction industry, appointed by the JAC.

Sec. 2.

(a) The JAC shall meet quarterly and among its other duties and responsibilities it shall, at each meeting, review the record of disputes filed with the Administrator and in particular shall review the record of decisions involving the same trades as submitted by the Administrator in accordance with Article IV, Section 6 hereof.

(b) A dispute will be declared repetitive by the JAC when in its judgment such dispute is disruptive to the industry or seriously jeopardizes the operational integrity of the Plan. All parties to the Plan may bring a dispute to the JAC for such determination. The JAC will develop such criteria and guidelines to determine what constitutes a repetitive dispute. The JAC will issue a written report to the party or parties who have requested a decision from the JAC involving the dispute referred for such consideration. The written report will be timely and reflect the circumstances and criteria used by the JAC to determine whether or not said dispute is in fact considered repetitive.

(c) In the event the JAC declares a dispute to be repetitive, the JAC shall refer the matter to the National and International Unions involved for a period of not more than 90 days during which time the Unions shall consult with the Employer Associations who represent Employers who have responsibility for that type of work. The Unions shall endeavor to reach a national agreement governing future jurisdiction. The Administrator shall assist the Unions and may appoint a mediator to facilitate settlement. If an agreement is reached, it shall be attested to by the Administrator and shall serve as a criterion for decisions in future disputes. Should the National and International Unions fail to reach an agreement within 90 days, the Administrator shall refer the dispute to a National Arbitration Panel.

Sec. 3. In any case to go to a National Arbitration Panel, the Administrator shall notify all General Presidents of National and International Unions affiliated with the Department and the signatory Employer Associations stating the controversy to be considered. Only directly affected parties as determined by the JAC shall be allowed to intervene. Thirty days notice shall be given of the date set for the hearing. Briefs shall be submitted and exchanged by all parties to the dispute at least ten days prior to the hearing date.

Sec. 4. The National Arbitration Panel shall in every instance consider all pertinent evidence, including the criteria set forth in Article V, Section 8, and shall render a decision, if possible, within ten (10) days after the conclusion of the hearings. Copies of the National Arbitration Panel's decision shall be sent to all parties signatory to this Agreement.

Decisions of the National Arbitration Panel shall be immediately recognized under the provisions of the Constitution of the Department and Article IX of this Plan.

Decisions of the National Arbitration Panel shall be immediately accepted and complied with by the disputing unions.

Sec. 5.  In the event any party to a dispute fails to present its case within the stated time, the National Arbitration Panel shall, nevertheless, proceed with the case and make its decision on the basis of the evidence presented.

ARTICLE XI

TECHNOLOGICAL CHANGES

Sec. 1.  The JAC shall establish a standing Technological Change Committee. The Committee shall concern itself with technological changes in the building and construction industry as they affect the jurisdiction of the various affiliated unions of the Building and Construction Trades Department.  The Committee shall consist of ten members from the Building and Construction Trades Department and ten members from the signatory Employer Associations, respectively.  The Committee shall select a chairman and a secretary.

Sec. 2.  The Committee is authorized to establish subcommittees provided that there is equal representation of labor and management on each subcommittee.  Each subcommittee shall elect a chairman and a secretary.

Sec. 3.  The Committee shall study existing methods of construction and procedures as they relate to technological changes in the industry and make recommendations to the JAC.  The Committee may refer particular items to the crafts concerned who may establish committees to determine craft jurisdiction and report their decisions to the Department and the signatory Employer Associations.

Sec. 4.  The Committee shall submit a report of its activities, including reports from any subcommittees, quarterly to the JAC.

ARTICLE XII

NATIONAL AGREEMENTS REGARDING JURISDICTION

Sec. 1.  When national agreements regarding jurisdiction between National or International Unions have been negotiated, immediate notice of such agreements shall be given to the appropriate management groups.  Prior consultation with such groups regarding the making of agreements between National or International Unions is desirable and should be carried on.

Sec. 2.  National agreements entered into and properly signed by disputing National or International Unions shall be filed with the Administrator and attested by

23

the Administrator. Such national agreements shall take effect prospectively and shall not apply to jobs in progress at the time of execution. "Jobs in process" means any construction contract upon which the date for submission of bids or proposals has passed.

## ARTICLE XIII

## EFFECTIVE DATE, TERMINATION, CHANGE
## AND WITHDRAWAL

Sec. 1. This Agreement shall take effect on January 1, 2003, and shall remain in force and effect until December 31, 2004. If the parties do not agree to continue with the Plan as implemented on January 1, 2003, the provisions of the Plan in effect on December 31, 2002, will apply and shall continue in effect for each year thereafter unless terminated as provided for herein. Changes or amendments to this Agreement may be as provided for herein.

Sec. 2. If either the Department or any signatory Employer Association desires to change or terminate this Agreement it shall notify the other party in writing at least ninety (90) days before the anniversary date of this agreement. When notice for change is given, the nature of the changes desired must be specified in the notice. This Agreement shall be subject to change at any time by mutual consent of the parties hereto.

Any changes agreed upon shall be reduced to writing and signed by the parties hereto, the same as this Agreement.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and effective as of the day and year above written.

**E-FILED**
Friday, 02 November, 2007  01:53:16 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT

# E

# CONTRACT AGREEMENT

## BETWEEN
## CENTRAL ILLINOIS BUILDERS OF AGC

## AND

## PLASTERERS LOCAL NO. 18, AREA #59
## AFFILIATE OF THE O.P.I.A.

**May 1, 2006 to April 30, 2009**



## TABLE OF CONTENTS

| | |
|---|---|
| ARTICLE I – CONTRACT AGREEMENT…………………………………….. | 3 |
| ARTICLE 1 – RECOGNITION…………………………………………….. | 4 |
| ARTICLE II – JURISDICTION & JURISDICTIONAL DISPUTES………………… | 5 |
| ARTICLE III – MANAGEMENT RIGHTS…………………………………... | 6 |
| ARTICLE IV – FOREMAN OF SUPERINTENDENTS……………………….. | 6 |
| ARTICLE V – HIRING PROCEDURES & UNION SHOP………………………. | 6 |
| ARTICLE VI – RIGHTS OF BUSINESS REPRESENTATIVE…………………… | 7 |
| ARTICLE VII – OCCUPATIONAL SAFETY AND HEALTH ACT……………. | 8 |
| ARTICLE VIII – STRIKES AND LOCKOUTS…………………………….. | 9 |
| ARTICLE IX – HOLIDAYS……………………………………………. | 9 |
| ARTICLE X – DUTIES OF EMPLOYER……………………………….. | 9 |
| ARTICLE XI – SUBCONTRACTORS…………………………………… | 10 |
| ARTICLE XII – GENERAL WORKING CONDITIONS…………………….. | 10 |
| ARTICLE XIII – JOB STEWARD……………………………………. | 11 |
| ARTICLE XIV – ARBITRATION……………………………………. | 11 |
| ARTICLE XV – COMPLIANCE WITH LAWS BY BOTH PARTIES………….. | 12 |
| ARTICLE XVI – MOST FAVORED NATIONS……………………….  …. | 12 |
| ARTICLE XVII – UNION SECURITY………………………………. | 12 |
| ARTICLE XVIII – UNAUTHORIZED ACTIVITY……………………….. | 13 |
| ARTICLE XIX – WORKING HOURS-OVERTIME & SHIFT WORK………….. | 13 |
| ARTICLE XX– REPORTING……………………………………….. | 14 |
| ARTICLE XXI – WAGE SCALE………………………………….. | 15 |
| ARTICLE XXII – TRAVEL……………………………………….. | 16 |
| ARTICLE XXIII – BOND……………………………… …………….. | 17 |
| ARTICLE XXIV – CORPORATE SIGNATURE AUTHORITY ……………… | 17 |
| ARTICLE XXV – INDUSTRY ADVANCMENT CONTRIBUTION ………….. | 18 |
| ADDENDUMS …………………………………………………….. | 18-19 |

<u>CONTRACT AGREEMENT</u>

THIS AGREEMENT is herby made and entered into this 1st day of May, 2006 by and between Central Illinois Builders of AGC and other employers who may become signatory, party of the First Part, hereinafter referred to as the Employer, and PLASTERERS LOCAL NO. 18, AREA #59 affiliate of the O.P.I.A., Party of the Second Part, hereinafter referred to as the Union, WITNESSETH:

WHEREAS, it is believed that the interest of the general public, the Employer and the Union can best be served if a workable agreement exists between and among the parties, hereto, in the employment of skilled workmen on all classes of public and private work engaged in by the Employer in the area in Illinois hereinafter described; and

WHEREAS, the constitutional and legal right of the Employer to hire workmen or employees freely as he chooses and the constitutional and legal right of the workmen or employees to labor for such compensation and under such conditions as may be agreed upon, are mutually understood and respected by the parties hereto; and

WHEREAS, the reasonable demands by organized labor and unreasonable requirements by employers of labor are believed to be of equal hardship to and upon the welfare of the people and upon the communities herein the employees and the employees reside or perform their work; and

WHEREAS, competent craftsmen should be paid and should be willing to work on a scale and basis commensurate with their skill and knowledge of their trade and keeping with the wages and the standard of living in the district wherein their work is performed.

WHEREAS, this agreement shall cover work done in the following area in the State of Illinois: The Counties of Sangamon, Cass, Menard, Christian, Adams, Brown, Pike, Schuyler, Hancock and McDonough; and in the following area in the State of Missouri: The Counties of Scotland, Knox, Shelby, Lewis, Clark and Marion.

THIS AGREEMENT shall become effective May 1, 2006 and remain in full force and effect through April 30, 2009 and shall continue in force from year to year thereafter unless notice is given in writing to the other party at least sixty (60) days prior to the expiration date.

Individual EMPLOYERS signatory hereto who are not members of the said Association agree to be bound by any amendments, extensions or changes in this Agreement agreed to between the UNION and the Association further agree to be bound by the terms and conditions of all subsequent Contracts negotiated between the UNION and Association unless ninety (90) days prior to the expiration of this or any subsequent agreement said non-member EMPLOYER notifies the UNION in writing that it revokes such authorization. Further, said non-member EMPLOYER agrees that notice served by the UNION upon said Association and mediation services for reopening, termination or commencement of negotiations shall constitute notice upon and covering the non-member EMPLOYERS signatory hereto.

IT IS THEREFORE UNDERSTOOD AN AGREED, by and between the parties hereto as follows:

ARTICLE I

RECOGNITION

SECTION 1.  The employer agrees to recognize, and does hereby recognize, the Union, its agents, representatives, or successors, as the exclusive bargaining agency for all the employees of the Company as herein defined.

SECTION 2. The employer will neither negotiate nor make collective bargaining agreements for any of its employees in the bargaining unit covered hereby unless it be through duly authorized representatives of the union.

SECTION 3. The term "employee" as used in this agreement shall include all employees of the employer who perform the following type work:

*All interior or exterior plastering of cement, stucco, stone imitation or any patent material when cast, the casting and setting of same.  This shall include the plastering and finishing with hot composition materials in vats, compartments of wherever applied, level five finishing of gypsum board; also, the setting in plaster boards, ground blocks, patent dots and cork plates.  The preparing, scratching and browning of all ceilings by this contract, allowing sufficient thickness to allow the applying of terrazzo or tile and application of any plaster material to ceilings, and employees covered by this contract shall perform, the perpendicular work except for a base six (6) inches or less when it is the same material as the floor.*

*Also included is all ornamentation work used on the inside or outside or any building in which "plaster of paris", "keen's cement", Portland cement, or any other building cements or patent mortars are used.*

*This shall also include work on lath, whether it be wood, board, expanded or perforated metal, where Portland or other hydraulic cements are used for stays, inclinations, copings, base work, platforms, etc.*

*Also included is all plaster and cement case work after it has the moulding in which it was cast or moulded.*

*Also included is all model or mould making, when done in the building on which it is to be used.*

*Also included is all pointing, patching and repairing of all kinds of plastering whatsoever; preparatory to painting, paperhanging and whitening.*

*Also included is all waterproofing of the work set forth above by means such as thoroseall, ironite, plasterweld and similar products, regardless of the tools used for the method of application or the color of materials used, and regardless of the type of base these materials are applied to.*

4

*Also included is all work on Marblecrete Duro-Glaze, epoxy matrix and application of any aggregate or similar materials.*

*Also included is all work on application of acoustic material, whether applied with trowel or gun.*

*Also included is the taping of all joints on veneer plaster work.*

*Also included is the plastering and finishing with hot composition material in vats, compartments or wherever applies; also the taping and pointing of all joints, nailholes and bruises on wallboard, and /or drywall, regardless of the type of materials or tools used, also the setting in place of plasterboards, ground blocks, patent dots, cork plates and brownstones and acoustical tile including temporary nailing, cutting and fitting in connection with the sticking of same.*

*All included is the preparation, all methods of installation and repair of all interior and exterior insulation systems (E.I.F.S.), including but not limited to, foam systems, bead boards, outsulation, ultralation, lead abatement, encapsulation and, all fire proofing and refraction work, including but not limited to, all steal beams, columns, metal decks, and vessels shall be the work of the plasters.*

*All work connected to the preparation, handling, mixing, building scaffolds, machine operation, and tending of the members of the bargaining unit shall be done with members of the bargaining unit. This section of the contract will only be used with mutual consent of both parties of this collective bargaining agreement.*

ARTICLE II

JURISDICTION AND JURISDICTIONAL DISPUTES

A.    It is agreed that the collective bargaining agreement covers all work jurisdiction of the OPCMIA as presently set forth in its International Constitution under the sections dealing with Plasterers' and Cement Masons' jurisdiction. The Employer agrees to recognize the jurisdictional claims of the union that have been established in the green book or as a result of decisions by the National Joint Board of the settlement of Jurisdictional Disputes.

B.    The Employer and the Union severally agree to be bound by all terms and provision of the plan establishing procedures for the resolution of jurisdictional disputes in the Construction Industry (hereinafter referred to as the "Plan"). In particular, the parties agree to abide by those provisions of the Plan requiring compliance with the decisions and awards of the Administrator, Arbitrator(s) or the National Arbitration Panels established under the Plan, and to fulfill the obligations of the Employer and the Union, respectively, as set forth in the plan or under this agreement.

C.    The Union and the Employer shall cooperate to the fullest extent in the settlement of jurisdictional disputes. There shall be no stoppage of work or slow down arising from any jurisdictional dispute.

## ARTICLE III

## MANAGEMENT RIGHTS

SECTION 1. The Employer retains full and exclusive authority for the management of its operations. The Employer shall direct his working forces at this sole prerogative, including but not limited to, hiring, promotion, overtime assignments, layoff and discharge.

SECTION 2. There shall be not limit on production by Employees nor restriction on the full use of tools or equipment. Employees shall use such tools as required to perform any of the work of the trade. The operation of all equipment shall be assigned to the appropriate craft jurisdiction. The only exception is stilts. Plasterers do not have to use stilts.

SECTION 3. No rules, customs or practices shall be permitted or observed which limit or restrict production, or limit or restrict the working effort of employees. The Employer shall determine the most efficient method or techniques of construction, tools or other labor saving devices used. However, safety of the Employees on the job site shall be of prime concern to the Employer. There shall be no limitation upon the choice of material or design. The Employer shall schedule work and shall determine when overtime will be worked.

SECTION 4. The Employer shall determine the recording devices, checking systems, brassing or other methods of keeping time records.

SECTION 5. The foregoing enumeration of management rights shall be deemed to be inclusive not exclusive. The Employer retains all management rights except as expressly limited herein or by locally negotiated agreements to the extent local agreements do not conflict with the terms and provisions of this agreement.

## ARTICLE IV

## FOREMAN OF SUPERINTENDENTS

It is agreed to by the signatory parties of this contract that all foreman or superintendents who have supervision over Journeyman plasterers and apprentices must have at least four (4) years experience as a practical plasterer.

A foreman shall be required for any jobsite with three (3) or more plasterers.

No foreman shall supervise two or more jobs at the same time for a contractor who is employing more than five (5) journeyman.

## ARTICLE V

## HIRING PROCEDURES AND UNION SHOP

6

A.    The employer shall be at liberty to hire employees in any manner permitted under the Labor Management Relations Act of 1947 and the Rules and Regulations of the National Labor Relations Board, which includes the legal right to use the facilities of the Union to obtain job applicants, however, under certain conditions explicitly provided as follows:

1.    The selection of employees or job applicants, by either the Employer or the union shall be on a non-discriminatory basis and shall not be based on or in any way affected by Union membership, by-laws, rules, regulations, constitutional provisions, or any other aspect or obligation of union membership, policies or requirement.

2.    The employer shall retain the right to reject any job applicant referred by the union

3.    The parties to this agreement shall post in places where notices to employees and applicants for employment are customarily posted, these provisions relating to the functioning of this hiring arrangement and subsequent union shop provisions.

B.    It is agreed that the Union shall maintain a list of employees or job applicants on a non-discriminatory basis, along with a record of their qualifications and experience and this list shall be made available to the employer, at the union office, when requested. This list shall be maintained for the convenience of both the employees or job applicants and the employer.

C.    When the Employer calls on the Union to refer job applicants to him, due care shall be exercised relative to the qualifications, experience and ability to perform the duties named in the request, of the person referred.

D.    In maintaining the job applicant list at the Union office the first person reporting out of work or making application for work shall be placed at the tip of the list, then so on down the list, in the order that they report or apply. Then, when making referrals, the Union shall start at the top of said list and make same in accordance with paragraph C of this Article.

E.    When securing new employees, the Employer will give preference where possible, to workmen residing in the Counties of Sangamon, Cass, Menard, Christian, Adams, Brown, Pike, Schuyler, Hancock and McDonough; and in the following area in the State of Missouri: The Counties of Scotland, Knox, Shelby, Lewis, Clark and Marion.

## ARTICLE VI

### RIGHTS OF BUSINESS REPRESENTATIVE

The Business Representative of the Union shall be granted the privilege to visit any job at any time to consult the steward on the job or to confer with the employer or his

7

representatives. Further than this, there shall be no further interference except for observation or in cases of emergency or necessity. General consultants with employees, when desirable, shall be held before starting time, at noontime, or after quitting time.

## ARTICLE VII

### OCCUPATIONAL SAFETY AND HEALTH ACT

1. The Employer, the Union and Employees will cooperate in the attempt to prevent accidents and the promotion of safe work habits and safety and health Employees.

2. Protective equipment is required by the applicable standards of the federal and state safety and health regulations shall be worn by the employees in accordance with those standards as a condition of employment.

3. The Employer shall be responsible for furnishing protective equipment as required to meet applicable standards. Items of a custom fitted nature, such as prescription safety glasses shall be furnished by the Employee.

4. Safety Equipment furnished to an Employee by the Employer for use while working for the Employer must be returned to the Employer in order for the Employees to receive a replacement. The Employee who fails to return any safety equipment furnished to him by the Employer for use while working for the Employer will have an amount equal to the cost of the Employer of such equipment deducted from his pay.

5. It is recognized that there are important roles to be performed by both management and labor in the prevention of accidents and to ensure a safety and healthy work environment. The work site shall be maintained in a clean and orderly state, which in-turn will encourage a safe, efficient and more productive operation.

It is important to succeed in this mutual endeavor. Failure of this effort can produce emotional stress, financial hardship and loss of work not only to the Employee, but also to the Employer.

It is of mutual benefit to both labor and management to work together and pledge jointly that they will do all that is conceivable to maintain a safe, hazard free work environment on each job site. Regular job site inspections, continuous safety training on and off the job site, establishment of emergency procedures for each job site and commitment of continuing teamwork between the parties to this agreement will produce the desired results.

It also should be noted that if any employee fails to comply with any of the company's safety rules or policies, that employee may find himself/herself in jeopardy of being dismissed by the Employer.

## ARTICLE VIII

## STRIKES AND LOCKOUTS

1. There shall be no strikes, other work stoppages or slow down or lockouts during the life of this agreement until the grievances and arbitration procedure herein provided for shall be exhausted.

2. The Union shall not sanction or encourage any of it's members:
   a) to engage in any picketing establishing or furthering a secondary boycott or illegal strike;
   b) to refuse to cross a picket line set up supporting any illegal strike or secondary boycott;
   c) it shall not be a breach of contract for employees to refuse to cross a legal picket line.

## ARTICLE IX

## HOLIDAYS

The following holidays, together with Sundays, shall be regarded as legal holidays, and the overtime rate of double time shall prevail on those days:

| | | |
|---|---|---|
| New year's Day | Decoration Day | Independence Day |
| Labor Day | Thanksgiving | Day Following Thanksgiving |
| Christmas Day | | |

Or days recognized as such. Holiday falling on a Saturday shall be recognized on Friday. Holidays falling on a Sunday shall be recognized on Monday.

No work shall be performed on Labor Day except for the Preservation of life or property.

## ARTICLE X

## DUTIES OF EMPLOYER

All Employers shall agree to pay social security tax (FICA) as required by law, and shall contribute to the unemployment compensation fund of the State of Illinois to the end that the Employees may be covered by this Act.

The Employer shall furnish the Union with a certificate of insurance and public liability insurance on or before the 1st of May each year and shall furnish the Union with their state assigned unemployment compensation number.

The Employer shall be required to observe safety, health and sanitation laws as approved by the Industrial Commission of the State of Illinois.

9

The Employer agrees that all conditions of employment relating to wages, hours of work, overtime differentials and general working conditions shall be maintained at not less than the highest minimum standards in effect at the time of this Agreement, and the conditions of employment shall be improved wherever specific provisions for improvement are made elsewhere in the Agreement. All previous National Joint Jurisdiction Board decisions shall be strictly adhered to between the parties.

Any party, employer, or association of employers that adopts this Agreement or otherwise become signatory to the Local Union shall be obligated to pay all fringe benefits on behalf of all employees. With respect to owners or sole proprietors, they shall pay at the rate of forty (40) hours per week provided, however, that the owners or sole proprietors are working with the tools.

### ARTICLE XI

### SUBCONTRACTORS

In the event the employer shall sublet any work on any projects to a subcontractor, said employer shall inform the subcontractor of the existence of this Agreement and shall furnish him a copy of same. If a conflict of interest should occur between the employer, his subcontractor and the Union over the application of this Agreement, such conflict of interest shall be arbitrated in accordance with the provisions of the Agreement. Any decision arrived at, through the operation of the article, shall be referred to the attorneys of the parties who shall be empowered to make necessary changes in order that there be no violation of existing laws.

### ARTICLE XII

### GENERAL WORKING CONDITIONS

General working conditions agreed upon by the parties to this agreement are as follows:

It is agreed by and between the signatory parties that all work performed within the area covered by this agreement shall be in strict conformity with the Code of Standard Practices of Lathing and Plastering as adopted by the National Bureau for Lathing and Plastering and as approved and adopted by the Bureau of Lathing and Plastering of Springfield, Illinois.

All Employees will have clothes changed and be ready for work at the scheduled start time. Also, sufficient time shall be allowed to all workmen to clean their tools and change their clothes. Cleaning tools means both the tools owned by the employer and those owned by the workmen.

There shall be one (10) ten minute, unorganized coffee break, rest period or other non-working time established during mid-morning. Employees may take individual thermos of coffee or non-alcoholic refreshments to

their assigned place of work and consume same as time and work schedule allow.

Contractors will furnish to the employees covered by this Contract all rods, darbies, float and sponges.

If requested by the Union, a pre-job conference shall be held before any job is started.

It is agreed that when an employee is laid off, he shall be paid off with one-half (1/2) hour to pack his tools. Where this is not complied with, pay shall be made at the rate of the double time until the employee receives his pay.

On residential work, employees covered by this contract, may agree to work on stilts on hardcoat, but shall not be required to do so. When stilts are used, they shall be furnished by the Employer.

## ARTICLE XIII

### JOB STEWARD

Job stewards will be elected or appointed by the Business Representative of the Union if and when he sees the necessity. Stewards shall perform their assigned tasks the same as any other employee and there shall be no non-working stewards. A steward shall not leave his assigned duties during working hours except to discharge his duties as steward. A steward shall have no union authority whatever except to hear minor grievances and attempt to settle same in accordance with this working Agreement, to help keep harmony on the job and to make reports to the Business Representative of alleged violation of the Agreement. A steward shall have no authority whatever to call a strike, cause a slow down or to impose unethical conditions on the Employer of the Employees.

## ARTICLE XIV

### ARBITRATION

There shall be no stoppage of work on account of any difference of opinion or dispute which may arise between the Employer and the Union relative to the application of the wage scale, working conditions, and jurisdiction provisions contained in this agreement.

In cases where differences of opinions or disputes arise on the specific job and same cannot be adjusted promptly between the job steward, if any, or the employees and foreman in charge, then the matter shall be referred to the Employer and the business representative of the Union for settlement; if this procedure fails to bring about a satisfactory and promptly adjustment of the question in dispute, then the entire matter shall be referred to an Arbitration Board Consisting of three (3) members, one to be appointed by the employer, one by the Union, and the third member of the Board to be chosen by these two; the Arbitration Board shall act as promptly

as possible and conduct a hearing, to which all principals to the dispute had been given adequate notice to appear and to testify; after hearing all testimony in the matter, the Board shall render a decision within three (3) days and the same shall be binding on all parties to the dispute.

Any expense incurred through the use of the Arbitration Board procedure shall be paid by the losing party.

ARTICLE XV

COMPLIANCE WITH LAWS BY BOTH PARTIES

It is the intention of the parties hereto that each will comply with all applicable State and Federal laws and administrative rules and provisions, including those with reference to relations between employers and employees, and all matters pertaining thereto, including those with reference to obligations of employers to furnish and maintain washrooms and toilet facilities, carrying Workmen's Compensation insurance, etc., and that the Company will continue to provide an adequate supply of cool drinking water for all employees covered by this contract. Accordingly, all such laws, rules and regulations are incorporated herein and in the event any provisions of this agreement conflicts with such laws, rules and regulations, then such laws, rules and regulations shall prevail over this agreement, and neither party will be bound by such invalid article, paragraph or section of this Agreement, provided however, that said articles, shall be denied to the separable and the invalidity of any portion thereof shall not affect the validity of the remainder. If the Company fails to provide a supply of cool drinking water to the employees covered by this contract, or fails to comply with any such rules, laws, and regulations, then any of the employees covered by this contract fail to comply with any applicable State or Federal law or administrative rule or provision, then the Employer may take steps as it deems reasonable to compel such compliance by the employees.

ARTICLE XVI

MOST FAVORED NATIONS

Should the Union enter into an agreement with any other Employer or Association which provides better wages and/or terms and conditions of employment, then such wages and/or terms and conditions of employment, shall automatically apply to the Employers signatory to this Agreement.

ARTICLE XVII

UNION SECURITY

It is understood and agreed by and between the parties hereto that as a condition of continued employment, all persons who are hereafter employed by the Employer in the unit which is the subject of this Agreement shall become members of the Union not later than the 8th day following the beginning of their employment by the Employer in said unit of persons who

are already members in good standing of the Union shall be continued employment of persons who were in the employ of the employers prior to the date of this Agreement and who are not now members of the Union, shall be conditioned upon those persons becoming members of the Union not later than thirtieth day following the execution date of this Agreement.

The failure of any person to become a member of the union at such required times shall obligate the employer, written notice from the Union to such effect and to the further effect that Union membership was available to such person on the same terms and conditions generally available to others members, to forthwith discharge such person. Further, the failure of any person to maintain his Union membership in good standard as required herein shall, upon written notice to the Employer by the Union to such effect obligate the Employer to discharge such person.

## ARTICLE XVIII

## UNAUTHORIZED ACTIVITY

A.      It is understood and agreed that the Union shall have no financial liability for acts of the employees, its members or agents which are unauthorized and which the Union cannot control. It is agreed, however, that in the event of any such unauthorized action, the Union shall, upon receiving notice hereof, immediately urge the employees to cease and desist or to return to work at once, if there should be a work stoppage and promptly address a letter to the Employer giving notice that the action referred to herein is unauthorized.

B.      The Employer shall be privileged to discipline employees responsible for such unauthorized activities without violation of the terms of this Agreement.

C.      In order that the Employer may be apprised of the office of the Union empowered to authorize strikes, work stoppages, or actions of employees under this agreement, it is understood and agreed that only Business Representative of the Union has such power or authority to authorize any such action or give orders or directions necessary to carry out such action.

## ARTICLE XIX

## WORKING HOURS – OVERTIME AND SHIFT WORK

A.      Eight hours shall constitute a regular days work and forty hours a regular week's work, Monday to Friday, inclusive, and the starting time shall be 8:00 a.m. unless otherwise agreed upon by the employer and the Business Representative of the Union.

B.      When a single shift is worked, eight hours of continuous employment, except for a lunch period of no less than one-half hour nor more than one hour, shall constitute a day's work. Any time worked prior to 8:00 a.m. or subsequent to 4:30 p.m. on Monday through Friday, and any time worked on Saturday shall be paid for at that rate of time and half (11/2).

C.    The overtime rate of pay for all Holidays worked or work performed on Sunday shall be at the double time rate.

D.    By mutual agreement between the Union and the Employer, a work week consisting of four (4) ten (10) hour days may be utilized on a project.

The work day shall consist of ten (10) hours worked between the hours of six o'clock (6:00) a.m. and five thirty (5:30) p.m., including lunch.

The work week shall consist of four (4) ten (10) hour days commencing at six o'clock (6:00) a.m. Monday and ending at five thirty (5:30 p.m.) Thursday.

All hours worked in excess of ten (10) hours per day, Monday through Thursday shall be paid at the rate of time and one-half (1 1/2) the regular rate of pay.

In the event that weather conditions or other acceptable conditions to the Union prevent work from being performed on a regular work day, then Friday shall be considered a regular work day at the straight time rate of pay (only to attain forty (40) hours per week). If Friday is worked as a regular work day, then any work performed on Saturday will be paid at the time and one-half (1 1/2) rate of pay.

In the event that the regular four (4) ten (10) hour days are worked and an Employer wants to work Friday, then all hours worked on Friday shall be paid at the rate of one and one-half (1 1/2) the regular rate of pay.  In such case, any time worked on Saturday shall be paid at the double time rate of pay.

Sundays and Holidays shall be paid at the double time rate of pay.

The Employer shall provide the Union with the starting date and the conclusion date so that it may be determined that such request is not for the purpose of circumventing the overtime provisions of this contract.

An afternoon break will be permitted when an employee works a 4/10's schedule.  When employees are required to work beyond ten (10) hours per day, they shall receive an additional lunch period.

## ARTICLE XX

## REPORTING

If the services of any employee covered by this agreement are not required or wanted, said employee shall be so notified the previous day by the foreman or whomever may be in charge; otherwise the employee shall report for work and shall be allowed two hours pay applying to that day or shift for reporting and finding no work.  The employee shall remain on the job for the two hours if so directed to do so by the foremen in charge, and the employee shall not be required to wait on the job longer than one-half hour to be so directed.  If any employee is allowed to start to work after once reporting, he shall be paid for four hours time applying to that day or shift and shall remain on the job for the duration of the four hour shift at the applicable

14

rate for that day for shift; provided, however, that there is no shut-down after the four hours on account of weather conditions, in which case the employee shall be paid for the times worked after the first four hours.

Nothing in this agreement shall preclude the Employer or his foreman from stopping an employee from coming to work at any time so long as the employee is notified in adequate time before leaving his place of residence. This distance the employee has to travel to the job shall be taken into consideration along with an understanding with the employee as to the time he usually leaves for work. Employees may be notified either in person or by telephone. It will be the responsibility of the employer or his foreman to obtain the address and telephone numbers of his employees covered by this Agreement for the purpose stated above, and those employees who cannot furnish an adequate way of contact shall sacrifice their rights for show-up time pay.

If any time the job is stopped due to weather conditions, the employee will be paid for the time actually worked.

## ARTICLE XXI

## WAGE SCALE

APPRENTICE WAGES SHALL BE AS FOLLOWS:

1st 6 months – 55% of Journeyman's wages
2nd 6 months – 60% of Journeyman's wages
3rd 6 months – 65% of Journeyman's wages
4th 6 months – 70% of Journeyman's wages
5th 6 months – 75% of Journeyman's wages
6th 6 months – 80% of Journeyman's wages
7th 6 months – 90% of Journeyman's wages
8th 6 months – 95% of Journeyman's wages

If an apprentice does not work 500 hours within the six (6) month period, then and in that event the apprentice does not qualify for a wage increase.

The apprentice wage rate will be established by the parties to this contract and registered with the State Apprenticeship Bureau.

In addition to all other payments or contributions called for in this Agreement, the Employers agree to pay the appropriate sum per hour, as per the addendum attached hereto and incorporated herein, for each hour worked by any employee covered by this contract to a certain fund known as the "Indiana State Council of Plasterers' and Cement Masons" Health and Welfare Pension Fund", and the parties agree that said payments shall be made monthly, the payment for each month to be made by the 10th of the following month at a location designated by the Local union, and in the event payments to this fund are not paid by the 15th of the month following the month for which payments are made, additional charge shall be paid per employee covered by the contributing employer.

In addition to all other payments or contributions called for in this Agreement, the Employers agree to pay the appropriate sum per hour, as per the Addendum attached hereto and incorporated herein, for each hour worked by any employee covered by this contract to certain fund known as the "I.P. & C.M. Pension fund" and the parties agree that said payments shall be made for all periods during the life of this contract, the payments shall be made for each month to be made by the 10th of the following month at a location designated by the Local Union, and in the event payments to this fund are not paid by the 15th of the month following the month for which payments are made, additional charge shall be paid per employee covered by the contributing employer.

In addition to all other payments or contributions called for in this Agreement, the Employers agree to pay the appropriate sum per hour, as per the Addendum attached hereto and incorporated herein, for each hour worked by any employee covered by this contract to a certain fund known as the "I.P. & C.M. Pension fund" and the parties agree that said payments shall be made for all periods during the life of this contract, the payments shall be made for each month to be made by the 10th of the following month at a location designated by the Local Union, and in the event payments are not made, additional charge shall be paid per employee covered by the contributing employer, any charge in the future contribution rate for the I.P. & C.M. Fund will be deducted form the present scale until the expiration date of this contract.

Contributions referred to above, that is, Health and Welfare, Pension and Apprentice Training contributions, are to be made on forms furnished by the appropriate funds, if available, and, in event, whether available or not, the contributions shall be payable to the funds as a location to be designated by the Local Union.

Check off's are to be sent to the Secretary of Local 18, by the 10th of the following month. Check off's shall be 5% of the total package.

Expenses incurred by any Employee covered by this contract authorized by and for the benefit of the Employer shall be borne by the Employer.

ARTICLE XXII

TRAVEL

The Employer shall pay the Employees' room and board expenses (sixty dollar [$60.00] minimum) when the Employee is required to stay out of town overnight.

All Employees are to travel to and from work on their own time on all jobs within the jurisdiction of their historic Local Union territory (Cass, Christian, Menard and Sangamon counties).

For travel outside of the original four counties (Cass, Christian, Menard and Sangamon counties), Employees will be reimbursed at the current IRS rate, one (1) way from the shop or Employees residence, whichever is closest.

For travel over one hundred (100) miles one (1) way, the Employee will have the option to stay overnight.

## ARTICLE XXIII

### BOND

Unless waived by mutual agreement between the Employer and Union, any Employer signatory to this Agreement shall obtain and maintain during the term of this Agreement a surety bond acceptable to the Trustees in the amount of Twenty-Five Thousand Dollars ($25,000), to guarantee to his employees under this Agreement the payment of wages, fringe benefits, and other payments as listed above.

In the event of failure, default, or refusal of an Employer to meet his obligations to his Employees to pay all monies specifically set forth in the Current Addendum to this Agreement, when due, the Union aggrieved Employees Fund, and Training Fund, after written notice to the Employer, may file claim to obtain payment, costs and reasonable attorney's fees from the applicable surety bond.

Said failure of an individual Employer who as defaulted to obtain and maintain an effective surety bond as required herein or failure and default by an individual.

Employer who has defaulted of payments of obligations covered by the Union a gross breach of this Agreement by the individual Employer who has defaulted in consequence of which the Union shall have the right to take any economic action, including refusal of Employees to work for the individual Employer and picketing the individual Employer to obtain compliance by the individual Employer who as defaulted with the Agreement, notwithstanding any other provisions of this Agreement.

Failure of an Employer to obtain and maintain an effective Surety Bond as required herein, or failure and default by an Employer of payment of obligations covered by this Agreement in excess of the amount of the Surety Bond, may at the option of the Union, be declared by the Union a gross breach of the Agreement in consequence of which the Union shall have the right to take any economic action, including refusal of employees to work, and also, have the right to picket, in order to obtain Employer compliance with this Agreement, not withstanding any other provisions of this Agreement.

## ARTICLE XXIV

### CORPORATE SIGNATURE AUTHORITY

For purposes of signing any union documents, a signature must be secured from a duly authorized officer of the corporation, company, partnership or other recognized legal structure to be considered valid and binding.  Under no circumstances shall a craft employee be allowed to sign on behalf of the employer.

## ARTICLE XXV

### INDUSTRY ADVANCEMENT CONTRIBUTION

It is mutually agreed that the Employers signatory to this Agreement shall pay into an Industry Advancement Fund the sum per hour as denoted in the Addendum. Any employer signatory to this agreement who fails to make the IAF contribution shall be subject to a penalty of ten percent (10%) of the previous month's non-payment. Additional penalties of ten percent shall be due every thirty days thereafter, until payment is made. A non-contributing contractor will also be subject to all reasonable legal collection fees relating to the non-payment of the IAF contribution.

The CIB/IAF contribution will be increased to .13 cents per hour effective May 1, 2006, to .14 effective May 1, 2007 and to .15 effective May 1, 2008.

### CONTRACT ADDENDUM
### REGARDING WAGES, FRINGE BENEFITS AND
### FOREMEN'S AND JOURNEYMAN'S PAY

### JOURNEYMAN WAGES

Effective 5/1/06 through 4/30/07, the Total Package Increase is $1.48

Effective 5/1/07 through 4/30/08, the Total Package is $1.54

Effective 5/1//08 through 4/30/09, the Total Package is $1.60

---

### FOREMEN

### WAGES

Foreman will be paid $1.50 per hour over the journeyman base wage.

---

### HEALTH AND WELFARE PLAN

Effective 5/1/06 through 4/30/09, any increase from the previous year's rate to be out of the negotiated total package.

---

### PENSION PLAN

Effective 5/1/06 through 4/30/09, any increase from the previous year's rate to be out of the negotiated total package.

## APPRENTICESHIP PLAN

Effective 5/1/06 through 4/30/09, any increase from the previous year's rate to be out of the negotiated total package.

CENTRAL ILLINOIS BUILDERS
OF AGC

OPERATIVE PLASTERERS
LOCAL 18, AREA 59

_____
Executive Vice President

_____
Business Manager

_____
Date

_____
Business Representative

19

# EXHIBIT

# F

3:06-cv-03232-RM-BGC    # 24-3    Page 22 of 30
    3:06-cv-03232-RM-BGC    #      Page 2 of 6
12/17/2006    08:49    2027            :3
AUG-31-2006  11:28AM  FROM-

BAC TRADE JURISD                    PAGE  03/10

/-391  P.014/020  F-036

# PLAN FOR THE SETTLEMENT OF JURISDICTIONAL DISPUTES
## IN THE CONSTRUCTION INDUSTRY

In the Matter of Arbitration Between:

**J.P. Phillips, Inc. (Phillips)**
**The Responsible Employer**

And

The International Union of Bricklayers & Allied Craftworkers (BAC)

And

The Operative Plasterers and Cement Masons International Association (OPCMIA)

Plan File: IL 8/3/06 and IL 8/18/06

Before

Arbitrator John J. McMahon

Hearing: August 22, 2006

---

Regarding: Illinois State House, Springfield, Illinois

Appearances:  Tim Driscoll, BAC
Michael Gannon, OPCMIA
Michael Pilolla, J.P. Phillips, Inc.

---

### Introduction

I have before me two cases for determination. Case IL 8/3/06 is a jurisdictional dispute over plastering and restoration of plastering work being performed at the Illinois State House in Springfield, Illinois. There are two separate projects involved in the case, both being performed by Phillips but under subcontracts from different contractors. Case IL 8/18/06 involves a claim of an impediment to job progress by a Local Union of the OPCMIA. I was originally assigned to hear a third case, WI 7/11/06, involving the same parties, but that case was withdrawn prior to the hearing. I find that all parties are stipulated to the Plan. I will deal with the impediment to job progress case first.



EXHIBIT
F

3:06-cv-03232-BGC-BGC # 22-3 Page 23 of 30
3:06-cv-03232-RM-BGC # AUG-31-2006 11:26AM FROM- Page 3 of 6   BAC TRADE JURISD   PAGE   04/10
T-381   P.015/020   F-096

## Case II. 8/18/06

In this case, Phillips and the BAC claim that the OPCMIA and its Local 18 have violated the impediment to job progress provisions of the Plan by processing a jurisdictional dispute outside the Plan's approved procedures and then threatening to file suit to enforce the decision issued by the arbitrator in that other procedure. Article III, Section 3 of the Procedural Rules of the Plan, defines an impediment to job progress to include "Filing a grievance under a collective bargaining agreement, or under a local plan for the settlement of jurisdictional disputes not recognized by the [Building and Construction Trades] Department" and filing a court action involving a jurisdictional dispute or assignment of work.

The procedure for resolving jurisdictional disputes in the project labor agreement that led to the issuance of the decision by Arbitrator Glenn A. Zipp was not a procedure approved by the Building and Construction Trades Department. I find that the processing of the jurisdictional dispute under that procedure constituted an impediment to job progress within the meaning of Article III, Section 3. Similarly, any threat to enforce or attempt to enforce Arbitrator Zipp's decision also constitutes an impediment to job progress.

### Decision

The OPCMIA and its Local Union are hereby ordered not to threaten to file, file or pursue any other action in an attempt to enforce Arbitrator Zipp's August 8, 2006, bench decision and August 10, 2006, written decision, or engage others to do so in their behalf.

### Case II. 8/3/06

As noted above, there are really two separate jobs involved in this case. I have determined that the work performed by Phillips under a subcontract with EverGreene Painting Studios, Inc. has been completed. The policy of the Plan is not to issue a decision when the work is complete. I will not issue any decision on the work being performed under the EverGreene subcontract.

The second job is being performed by Phillips under a subcontract from Core Construction. As a Plan Arbitrator, I must follow the order of criteria of Article V, Section 8 of the Plan in arriving at a decision.

The first consideration is whether there are any agreements between the National or International Unions governing the dispute. I have determined that there are no agreements between the BAC and OPCMIA governing this dispute. The OPCMIA claimed that the project labor agreement was an agreement within the meaning of Article V, Section 8(a). The project labor agreement was not signed by the International Unions, and cannot be considered an agreement.

2

The next factor to consider is whether there is a previous decision of record governing the case. The BAC relies on a Decision of Record issued by a National Arbitration Panel on February 11, 2004, and amended by the National Arbitration Panel on March 11, 2004. This decision states unequivocally "Henceforth, all jurisdictional disputes between BAC and OPCMIA that are brought before the Plan shall be resolved in favor of the work assignment of the involved Employer." I find that this decision of record governs this case within the meaning of Article V, Section 8(b). Phillips assigned the work to the BAC. The decision of record requires that the contractor's assignment be sustained.

The OPCMIA does not dispute that the decision of record governs this case. The OPCMIA relies on Article V, Section 8(c) which allows the Plan Arbitrator to rely on prevailing practice if it is demonstrated that the recognized and established prevailing practice in the locality of the work has been contrary to the applicable decision of record. The BAC, relying on an August 12, 2004, decision of Plan Arbitrator Tony A. Kelly in Case PA 7/29/04, argues that the decision of record governing this dispute was intended to block reliance on Section 8(c).

I served on the National Arbitration Panel that rendered the decision of record. I concur with Arbitrator Kelly's interpretation that the intent of the National Arbitration Panel when it issued the decision of record was that because both unions performed plastering work and the repetitive disputes were disrupting the industry, henceforth the contractor's assignment would resolve the jurisdictional dispute "irrespective of any claims by either party to prevailing practice as set forth under c) of Article V, Section 8 of the Plan." For this reason I do not need to make a determination on prevailing practice under 8(c). I need not address any of the other lower criteria now that I have found the dispute governed by the decision of record.

### Decision

Therefore, it is my decision that the decision of record dated February 11, 2004, and amended on March 11, 2004, governs this dispute. The work shall continue as assigned by Phillips to plasterers represented by the BAC.

This decision shall only apply to the job in dispute.

John J. McMahon
Arbitrator
August 24, 2006

3

# EXHIBIT

# H

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Plan for the Settlement of Jurisdictional Disputes in the Construction Industry, By and Through its Administrator Richard M. Resnick,<br><br>                       Petitioner,<br><br>     v.<br><br>Operative Plasterers & Cement Masons' International Association of the United States and Canada<br><br>                    Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 07-0141 (RWR) |

### CONSENT ORDER

The parties have made the following representations to the Court:

1. Arbitrator John J. McMahon issued two arbitration awards on August 24, 2006 pursuant to the provisions of the Plan for the Settlement of Jurisdictional Disputes in the Construction Industry (hereafter "the Plan") and its Procedural Rules and Regulations.

2. In PLAN CASE IL 8/3/06, Arbitrator McMahon held that, based on a Decision of Record issued by a National Arbitration Panel on February 11, 2004, and amended by the National Arbitration Panel on March 11, 2004, which states that "all jurisdictional disputes between [the International Union of Bricklayers and Allied Craftworkers ("BAC") and the Operative Plasterers & Cement Masons' International Association of the United States and Canada ("OPCMIA") that are brought before the Plan shall be resolved in favor of the work assignment of the involved Employer," the plastering and restoration of plastering work at the Illinois State House in Springfield, Illinois that is in dispute "shall continue as assigned by [J.P. Phillips, Inc.] to plasterers represented the BAC."



EXHIBIT

H

Blumberg No. 5208

3. In PLAN CASE IL 8/18/06, Arbitrator McMahon ordered the OPCMIA and its Local Union "not to threaten to file, file or pursue any other action in an attempt to enforce [a decision by Arbitrator Glenn A. Zipp issued pursuant to an unapproved local arbitration procedure], or engage others to do so in their behalf."

4. The parties have agreed to resolve this litigation without expending any additional resources.

5. Therefore, the parties have jointly requested the Court to enter a Consent Order confirming Arbitrator McMahon's arbitration awards in both PLAN CASE IL 8/3/06 and PLAN CASE IL 8/18/06.

WHEREFORE, upon consideration of the parties' representations, it is hereby

ORDERED that the arbitration awards issued in PLAN CASE IL 8/3/06 (Arbitrator John J. McMahon, August 24, 2006) and PLAN CASE IL 8/18/06 (Arbitrator John J. McMahon, August 24, 2006) between the International Union of Bricklayers and Allied Craftworkers and the Operative Plasterers & Cement Masons' International Association of the United States and Canada are CONFIRMED.

Each side will bear its own attorney's fees and costs.

SO ORDERED.

_____
Richard W. Roberts
United States District Judge

Date: _2-14-07_____

- 2 -

# EXHIBIT

# K

MAR 11 2004  3:35 PM FR SHERMAN.DUNN.COHEN.  775 1950 TO 2023833183    P.02/03

# PLAN FOR SETTLEMENT OF JURISDICTIONAL DISPUTES
# IN THE CONSTRUCTION INDUSTRY

1125 Fifteenth Street, N.W., Suite 801, Washington, D.C. 20005

(202) 785-9300

Fax (202) 775-1950

March 11, 2004

## VIA FACSIMILE

John J. Dougherty, General President
Operative Plasterers' and Cement Masons'
   International Association of the United States
   and Canada
14405 Laurel Place, Suite 300
Laurel, Maryland 20707

John J. Flynn, General President
International Union of Bricklayers and
   Allied Craftworkers
1776 Eye Street, N.W.
Washington, D.C. 20006

Terence M. O'Sullivan, General President
Laborers' International Union
   of North America
905 16th Street, N.W.
Washington, D.C. 20006

RE:    Clarification of National Arbitration Panel Decision

Gentlemen:

Attached is a copy of correspondence I have received from the National Arbitration Panel. As directed by the Panel, the additional language will be included in the next printing of the Green Book.

Sincerely,

Richard M. Resnick
Administrator and Counsel to the Plan

Attachment

cc:    National Arbitration Panel
       Bridget O'Connor, Esq. - IUBAC
       Brian Powers, Esq. — OP&CMIA
       Greg Davis — LIUNA
       Parties to the Plan



EXHIBIT

K

## DECISION

After an arduous review of the evidence entered into this arbitration, the Panel finds good and sufficient reason to render the following decision.

Henceforth, all jurisdictional disputes between the BAC and the OPCM that are brought before the Plan shall be resolved in favor of the work assignment of the involved Employer. Jurisdictional disputes between the BAC or OPCM and LIUNA, or any other union(s) brought before the Plan shall be resolved under the procedures of Article V of the Plan.

On March 2, 2004, the Joint Administrative Committee requested clarification regarding the scope of the work encompassed in all jurisdictional disputes solely between the BAC and the OPCM to be resolved in favor of the work assignment of the involved Employer. Such scope is limited to <u>cement finishing and plastering work tasks</u>.


Thomas G. Pagan
Arbitrator

Andy Douglas
Arbitrator

John McMahon
Arbitrator



**EXHIBIT**

**K**